Case 4.95-cv-01262  Document 59  Filed on 01/31/96 in TXSD  Page 1 of 112

59

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SOUTHERN DISTRICT OF TEXAS
FILED

JAN 3 1 1996

Michael N. Milby, Clerk of Cc

| | |
|---|---|
| MMAR GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NO. 95-1262 |
| | ) |
| DOW JONES & CO., INC. and | ) **JURY TRIAL DEMANDED** |
| LAURA JERESKI, | ) |
| | ) |
| Defendants. | ) |

## MOTION FOR EXTENSION OF DEADLINES
## TO COMPLETE DISCOVERY AND FILE MOTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

Now come Dow Jones & Company, Inc., d/b/a *The Wall Street Journal* and Laura

Jereski, Defendants in the above-styled and numbered action, and file this, their Motion for

Extension of Deadlines to Complete Discovery and File Motions, and in support would show

the following:

**Request for Extension**

This case -- in which Plaintiff MMAR Group, Inc. ("MMAR") seeks to recover

millions of dollars from Defendants -- arrived in the Southern District of Texas in April of 1995,

having been transferred from the Eastern District of Texas. Only limited discovery of the

parties was taken before the transfer. Since that time, Defendants have worked diligently to

meet the initial discovery deadline of February 15, 1996. Although Defendants believe that

Plaintiff's claims will ultimately prove unsuccessful, Defendants -- in order to ensure that the



CIMPDF - www.faxio.com

factual record is fully and fairly developed -- now request that the discovery deadline, and the deadlines for all motions, be extended by a period of sixty (60) days.

Defendants have attempted to adopt an efficient approach to the disposition of this lawsuit by taking the discovery obtained prior to the transfer of the case to this Court and preparing and filing a Motion for Summary Judgment in August of 1995 that could dispose of at least some, if not all, of Plaintiff's claims without incurring the expense of discovery. Anticipating a ruling from the court that might obviate, or at least limit, the parties' need for discovery, Defendants did not immediately embark on discovery efforts. When no ruling was forthcoming and the time for preparing and filing expert reports approached, Defendants stepped up their efforts.[1]  As outlined later, the parties have moved into high gear on discovery, but absent a ruling from the Court on summary judgment that limits the issues raised and reduces the scope of discovery, the remaining time to complete needed discovery is inadequate. Defendants require more time to prepare this case properly for trial.

Defendants do not seek a change in the date for the filing of the pretrial order (June 1, 1996) or the date for docket call (July 5, 1996) if the case does go to trial.  Defendants do ask that the Court modify its order to provide a discovery deadline of April 15, 1996; a deadline for all dispositive motions of April 22, 1996; and a deadline of April 29, 1996, for all other motions.  These extensions are not sought for delay only, but so that justice may be done.

---

[1]Defendants have actively pursued discovery even though the NASD, on November 13, 1995, issued a decision that MMAR Group, Inc. engaged in fraud with its customer, LASERS. The NASD's decision says, in effect, that MMAR Group, Inc. cheated its best customer. Cheated that customer so badly, in fact, that the NASD panel sanctioned MMAR Group, Inc. by expulsion from the NASD and requiring disgorgement of $10,470,243.33 in excessive commissions to LASERS. The gravamen of Plaintiff's claim in this suit seems to be that the article accused it of treating LASERS unfairly, which the NASD's decision conclusively establishes. Defendants brought the NASD's decision to the Court's attention in their First Supplement to their Motion for Summary Judgment and still believe that Plaintiff is now collaterally estopped to deny the substantial truth of the article. Absent the Court's ruling, however, Defendants require additional time to complete discovery and to assure a proper record is made.

**MOTION TO EXTEND DEADLINES -- page 2**

CWPDF - www.fastio.com

## Discovery Efforts to Date

At the pretrial conference on August 25, the Court entered the scheduling order setting the discovery deadline for February 15. The scheduling order also provided for Plaintiff to provide expert reports by October 17 and Defendants to provide expert reports by November 21. Neither party scheduled depositions prior to October 17.

Plaintiff filed expert reports on October 17, and Defendants scheduled the depositions of Plaintiff's damages experts in early November. The undersigned counsel, who has lead discovery responsibility for this case, was involved in preparing for and attending a trial in Austin, Texas through most of September and October. Another counsel for Defendants deposed Cory Miner in early November, as well as Plaintiff's business valuation experts, and then Defendants' counsel devoted substantial attention to complying with the requirements for the filing of expert reports by November 21.

Following Thanksgiving, the parties scheduled and took depositions of some of Plaintiff's and Defendants' experts, as well as three non-party depositions before the Christmas and New Year's holidays ensued. Letters evidencing Plaintiff's requests for deposition times and Defendants' responses are attached as **Exhibit A** to this motion.

During the late December, early January timeframe, the undersigned counsel was unable to conduct interviews and work on scheduling depositions on behalf of Defendants because he was involved in another libel case pending in state district court in Houston, *Mike Herbert v. Home Box Office, Lee Grant, et al., and Time Warner Entertainment Co., L.P., et al.*, No. 93-041705, 190th District Court, Harris County, Texas. The undersigned counsel headed up the effort to seek a mandamus from the First Court of Appeals in Houston to require

CMPDF - www.fooso.com

a state trial judge to rule on a motion for summary judgment prior to trial, so that an interlocutory appeal could be pursued. The Court of Appeals issued the mandamus, and when the trial judge ruled, the undersigned counsel was involved in the interlocutory appeal of the trial court's order and efforts to stay the trial until the appeal could be heard. This required a substantial part of the undersigned counsel's time in December. Despite this activity, however, Defendants still cooperated with Plaintiff to accommodate Plaintiff's discovery in this action.

Since early January, the efforts of defense counsel have been focused largely on the instant lawsuit. Witness interviews, as well as formal discovery, have been ongoing. Depositions were taken by Plaintiff and Defendants in New York on January 22-27. Depositions are currently scheduled for January 30 and 31, and February 2, 5, 9, 13-15. A list of the depositions that have been taken, or are scheduled to be taken, in this action by the parties is attached as **Exhibit B**.

**Need for Additional Discovery**

Despite the efforts described above, additional time is required to adequately develop the factual record. Neither party has exhausted the fifteen non-party, non-expert depositions allowed by the Court in its August 25, 1995, order. Many witnesses in this case reside on the East or West coast, out of trial subpoena range. Because they cannot be required to come to trial, they must be deposed if the jury is to have an opportunity to hear their testimony. These include representatives of companies that dealt with the Louisiana State Employees Retirement System (LASERS), sources upon whom Laura Jereski relied in preparing her article, and other customers of MMAR Group that ceased doing business with it before the article ever appeared.

While Plaintiff waited one day less than a year to file this action and had an opportunity, before the lawsuit was filed, to begin preparations for this lawsuit, Defendants' counsel, on a relatively small time scale, have had to become familiar with this industry, identify potential witnesses, interview these witnesses, coordinate their schedules with other counsel, and try to arrange depositions when possible.

Completion of document discovery has also been delayed. While Plaintiff has produced some of the documents requested by Defendants, a significant number of documents have not been produced. Particularly, Plaintiff maintained a tape recording system at its location that recorded telephone conversations of many of the phones used at Plaintiff's Houston location. Many of these tape-recorded conversations are relevant to the issues raised in this lawsuit.

Plaintiff is involved in other lawsuits in which some of these tapes and transcripts of these conversations have been produced, but Defendants, despite their requests, have not been provided copies of those recordings and transcripts. Defendants, despite their requests and efforts to deal with Plaintiff's representatives, have not yet been provided an opportunity to listen to and copy tapes of conversations for periods that Defendants believe are relevant to this dispute. Attached as **Exhibit C** is a copy of a deposition given in another action by Bill Fincher, one of Plaintiff's representatives, outlining how the system works and some of the bottlenecks that limit the speed at which information can be obtained.

On January 30, 1996, Plaintiff's representative, Bill Fincher, returned calls from Defendants' counsel's office and, for the first time, made arrangements for Defendants' counsel's staff to review the already transcribed tapes and the arrangements for locating and identifying conversations on the large reel-to-reel tapes that recorded the telephone

conversations. A member of Defendants' counsel's staff immediately went to Houston to meet with Mr. Fincher and begin the process of copying transcripts and reviewing the as-yet uncopied or transcribed tapes. Defendants' counsel has been advised that there are approximately 1500 separate conversations that have already been copied and transcribed, and that a significant number of other conversations have not yet been located or copied. Plainly, many of these conversations will contain relevant information for this lawsuit. Defendants' counsel needs time to review the tapes, identify relevant conversations, and arrange to authenticate the conversations.

Plaintiff has also provided some trading record information on computer disk that has raised some important questions about its completeness that are as yet unresolved. A letter to Plaintiff's counsel concerning these questions, along with the response received from Plaintiff's counsel and Defendants' counsel's reply, is attached as **Exhibit D** to this motion.

### Efforts to Reach Agreement With Plaintiff's Counsel

Defendants' counsel raised with Plaintiff's counsel in November the possibility of agreeing to an extension of the discovery and motions deadline. Plaintiff's counsel orally refused at that time. Since that time, Plaintiff's and Defendants' counsel have worked together to arrange depositions, but the inevitable delays and scheduling problems that accompany busy law practices as well as the businesses of witnesses have prevented Defendants' counsel from locating, interviewing, and scheduling all of the necessary witnesses between November and February 15. Because Plaintiff's counsel had expressed a desire not to have more than one deposition scheduled a day and not to have depositions going simultaneously (and Defendants'

counsel shares that desire if time permits), Defendants' counsel has not tried to schedule simultaneous depositions. As a result, there is simply not enough time left between now and February 15 to afford Defendants the opportunity to obtain the fifteen non-party, non-expert depositions the Court said they could take in its August order. Defendants sent a letter on January 29 to Plaintiff's counsel, a copy of which is attached as **Exhibit E**, suggesting an agreed request to the Court to extend the discovery and motions deadline. Plaintiff's counsel has orally advised Defendants' counsel that they will object to an extension and has promised a letter to that effect after depositions in Austin are completed on January 31.

**Effect of Extension on Trial Date**

If the case does go to trial, this extension would not adversely affect the trial date. The pretrial order is due on June 1, and docket call is not scheduled until July 5. An extension of the discovery and motions deadlines into April will allow for a more complete record for presentation to the jury, if the case must be tried. The parties will still have time to prepare their pretrial order even with an April discovery cutoff.

**Approval of Defendants**

The Defendants have been provided a copy of this motion and have approved the request for the extension. Their signatures are included in this motion.

WHEREFORE, PREMISES CONSIDERED, Defendants request that the Court modify its August 25, 1995, scheduling order and provide that discovery be completed by April 15, 1996; that all dispositive motions be filed by April 22, 1996; and that all other motions be filed by April 29, 1996, and that the Court grant Defendants such other relief, at law or in equity, to which Defendants may show themselves justly entitled.

Respectfully submitted,

R. James George, Jr.
State Bar No. 07810000
David H. Donaldson, Jr.
State Bar No. 05969700
James A. Hemphill
State Bar No. 00787674

ATTORNEYS FOR DEFENDANTS
DOW JONES CORPORATION d/b/a
*THE WALL STREET JOURNAL* and
LAURA JERESKI

OF COUNSEL:

GEORGE, DONALDSON & FORD, L.L.P.
1000 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
(512) 499-0299
(512) 499-0094 (Telecopier)

## APPROVAL OF FILING OF MOTION:

FOR DOW JONES & CO., INC.
Ass't General Counsel

LAURA JERESKI

MOTION TO EXTEND DEADLINES -- page 8

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MOTION FOR EXTENSION OF DEADLINES TO COMPLETE DISCOVERY AND FILE MOTIONS has been delivered *via* hand-delivery, and certified mail, return receipt requested, to counsel of record:

> Kenneth M. Morris
> Morris & Campbell, P.C.
> 600 Jefferson, Suite 1617
> Houston, Texas  77002

on the ⟶ day of ⟶, 1996.

David H. Donaldson, Jr.
James A. Hemphill

A

ClickPDF – www.fastio.com

DEC-01-1995  16:25        RRIS & CAMPBELL                713 659 3020    P.002/003

MITCHELL E. AYER
JOHN S. BRANNON
RHETT G. CAMPBELL
PATRICIA H. CHICOINE
W. MARK COTHAM
KIRK W. EVANS
DAVID A. FURLOW
MARK C. HARWELL
JOHN R. KNIGHT
KENNETH M. MORRIS

# MORRIS & CAMPBELL
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
600 JEFFERSON, SUITE 1617
HOUSTON, TEXAS 77002

(713) 659-8697
TELEX: 794608 TCIH
FAX: (713) 659-3020

December 1, 1995

**VIA TELECOPIER NO. (512) 499-0094**

Mr. David H. Donaldson, Jr.
George, Donaldson & Ford
P.O. Box 684667
Austin, Texas  78768

> **Re:**  C.A. No. 95-1262; *MMAR Group, Inc. v. Dow Jones & Co., Inc.
> and Laura Jereski*, in the United States District Court for the
> Southern District of Texas, Houston Division.

Dear Mr. Donaldson:

We would like to take the depositions of the following persons as shown, who are under your client's control.

| | |
|---|---|
| David McHam | December 18th at 9:00 a.m. at our offices. |
| Robert Watson | December 22nd at 9:00 a.m. at our offices. |
| Stephen Magee | January 9th at 9:00 a.m. your office. |
| Scott Armstrong | January 10th at 9:00 a.m. your office. |
| A.J. Senchack | January 11th at 9:00 a.m. your office. |
| Gay Miller | January 24th at 9:00 a.m. at Dow Jones. |
| Jonathan Clements | January 24th after Gay Miller at Dow Jones. |
| Laura Jereski | January 25th at 9:00 a.m. at Dow Jones. |

Assuming that the last three depositions listed are taken on the dates shown, I suggest that you take the deposition of John Moore, currently scheduled for January 27th, at Dow Jones offices in New York. Mr. Moore resides in Buffalo, New York. If we are up there, and he is up there, it would seem logical and prudent to handle his deposition in that way.



CutePDF - www.fastio.com

Case 4:95-cv-01262  Document 59  Filed on 01/31/96 in TXSD  Page 12 of 112

Mr. David H. Donaldson, Jr.
December 1, 1995
Page -2-


     Also, assuming these dates work, we will plan to take Rafael Grinburg's deposition on January 23rd in New York.

     With regard to the subpoena you served on the NASD, please make a duplicate copy of whatever documents they produced to you. If the documents are voluminous, please have them duplicated by an outside copying service. In any event, we will reimburse the costs of copying.

     Thank you for your cooperation.

                Very truly yours,

                Mark C. Harwell

MCH/der

# GEORGE, DONALDSON & FORD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELORS AT LAW

David H. Donaldson, Jr.
Writer's Direct Number:
(512) 495-1414

1000 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
(512) 495-1400

Post Office Box 684667
Austin, Texas 78768-4667
Fax: (512) 499-0094

December 6, 1995

Mr. Mark C. Harwell
Morris & Campbell, P.C.
600 Jefferson, Suite 1617
Houston, Texas 77002

*via* Telecopy (713) 659-3020

Re:  C.A. No. 95-1262; *MMAR Group, Inc.*
*v. Dow Jones & Co., Inc. and Laura Jereski*;
U.S.D.C., S.D. Texas, Houston Division

Dear Mark:

This is in response to your letter dated December 1, 1995, concerning deposition scheduling as well as a report on our expert's ability to respond to the subpoena duces tecum that you have arranged to have served on them.

1.   **Expert responses to subpoenas.** We are assuming that you simply want to look at the documents from the experts to decide what you wish to copy. Do you need the experts to show up or do you just need the documents? Do you expect to ask any questions? Do they get their documents back, and if so, how soon? Please let me know your intentions on this.

2.   **Bob Watson.** After receiving the subpoena, Bob Watson advised me that he has been called out of town on a family illness and is not even sure that he will be back in Houston by the return date of the subpoena. I have not talked to him since he sent me a fax advising me of this problem. We do not anticipate any difficulty in getting to you the documents once he is available, but until he is available we hope we can get your understanding on his being unable to produce the documents on Friday, December 8. I will follow up with him to assure that there is not a significant delay in providing the documents. Because he is out of town, I have been unable to check with him concerning your proposed December 22 date for his deposition. I am available on that day and we have no objection in scheduling the deposition in your offices if Mr. Watson is available.

3.   **Stephen Magee.** We expect to have the documents responsive to the subpoena available for production on Friday, December 8. Professor Magee tells me, however, that he is unavailable to be deposed on January 9, 1996, because of a previously scheduled vacation. The first day that he is available to be deposed is on January 23 and pretty much any

GEORGE, DONALDSON & FORD
A REGISTERED LIMITED LIABILITY PARTNERSHIP

Mr. Mark C. Harwell
December 6, 1995
Page 2

Monday, Tuesday, or Wednesday in the following weeks. Please let us know your preference on scheduling his deposition.

      4. **Access to Tapes.** In reviewing your response to the request for production of documents you indicated a practical problem in trying to produce all of the tapes that are at issue, but we would at least like to be able to designate particular days that you can produce for our inspection and copying. Particularly, we would like you to produce the tape of all conversations on October 21, 1993, as well as the tape of all conversations on the date that Cory Miner announced to the employees of MMAR Group that it was shutting down its operations (we believe this is November 18).

      Please let us know if it is possible to provide us copies of the tapes for those days. Also, please get back to me and let me know whether the modifications in the deposition schedule that we have proposed will work.

                Sincerely yours,

                GEORGE, DONALDSON & FORD, L.L.P.

                By _____
                    David H. Donaldson, Jr.

DHDjr/db

E

CVtsPDF – www.fastio.com

## DEPOSITION LOG: DEPOSITIONS TAKEN
### MMAR GROUP, INC. *v.* DOW JONES & CO., INC., and LAURA JERESKI

| DATE TAKEN | WITNESS | TAKEN BY | VIDEO | EXHIBITS | LOCATION TAKEN |
|---|---|---|---|---|---|
| 03/21/95 | **MMAR Group, Inc.** by **Forrester, Lawrence** | Defendant | ✓ | 1-62 | Houston |
| 03/29/95 | **Jereski, Laura** | Plaintiff | ✓ | 1-41 | New York |
| 03/30/95 | **Dow Jones** by **Calame, Byron** | Plaintiff | ✓ | 42-52 | New York |
| 11/03/95 | **Thomson, John** | Defendant | ✓ | Thomson 1-33 | Houston |
| 11/09/95 | **Beach, Christopher** | Defendant | ✓ | Beach 1-50 | Houston |
| 11/10/95 | **Miner, Corey** | Defendant | ✓ | Miner 1-17 | Houston |
| 11/20/95 | Bloom, Lee (for **Duff & Phelps** on written questions) | Defendant | | Not numbered | Chicago |
| 11/28/95 | **Copeland, James** | Defendant | | Copeland 1-33 | Houston |
| 11/29/95 | **Burbank, Thomas** | Plaintiff | ✓ | Burbank 1-82 | New Orleans |
| 12/13/95 | **Robinson, William** | Defendant | ✓ | Robinson 1-11 | Florida |
| 12/14/95 | **Putnam, Steven** | Defendant | ✓ | Putnam 1-37 | Florida |
| 12/18/95 | **McHam, David** | Plaintiff | ✓ | McHam 1-8 | Houston |
| 12/19/95 | **Rooney, Edmund** | Defendant | | Rooney 1-40 | Houston |
| 12/20/95 | **Tomlinson, Don** | Defendant | | Tomlinson 1-29 | Houston |
| 01/08/96 | **Watson, Robert** | Plaintiff | ✓ | Watson 1-6 | Houston |
| 01/09/96 | **Whitehead, Martha** | Plaintiff | ✓ | Whitehead 1-10 | Austin |
| 01/12/96 | **Watson, Robert** | Plaintiff | ✓ | | Houston |
| 01/22/96 | **Armstrong, Scott** | Plaintiff | ✓ | [Yes] | New York |
| 01/23/96 | **Grinberg, Raphael** | Plaintiff | ✓ | [Yes] | New York |
| 01/24/96 | **Miller, Gay** | Plaintiff | ✓ | [Yes] | New York |
| 01/25/96 | **Jereski, Laura** | Plaintiff | ✓ | [Yes] | New York |
| 01/27/96 | **Moore, John** | Defendant | | Moore 1-47 | New York |
| 01/30/96 | **Magee, Stephen** | Plaintiff | ✓ | Magee 1-* | Austin |
| | | | | | |



## DEPOSITIONS SCHEDULED (OR TO BE SCHEDULED)
## MMAR GROUP, INC. *v.* DOW JONES & CO., INC., and LAURA JERESKI

| SET FOR | WITNESS | SET BY | VIDEO | LOCATION |
|---------|---------|--------|-------|----------|
| 01/31/96 | Senchack, A.J. | Plaintiff | | Austin |
| 02/02/96 | Ramirez, Frank | Defendant | ✓ | Dallas |
| 02/05/96 | Brown, Paul | Defendant | ✓ | Austin |
| 02/06/96 | Evans, Richard | Defendant | ✓ | Houston |
| 02/09/96 | Shingleton, Michael | Defendant | ✓ | New Hampshire |
| 02/14/96 | NASD | Defendant | ✓ | New Orleans |
| 02/14/96 | Favret, Andrew (NASD) | Defendant | ✓ | New Orleans |
| *To be set* | Bank of New York Representative | Defendant | | New York |
| *To be set* | Banco do Portuguesa Representative | Defendant | | New York |
| *To be set* | Callan & Associates Repesentative | Defendant | | San Francisco |
| *To be set* | Fincher, William | Defendant | | Houston |
| *To be set* | Leider, Arthur | Defendant | | San Diego, CA |
| *To be set* | Buntjen, Worth (Piper Jaffray) | Defendant | | Minneapolis |
| *To be set* | MMAR Group Representative | Defendant | | Houston |
| *To be set* | Dobson, Sean | Defendant | | Houston |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

C

CVePDF - www.fasioo.com

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF LOUISIANA

3    _ _ _ _ _ _ _ _ _ _ _ _ X

4    LOUISIANA STATE            ) Civil Action No. 93-972

5    EMPLOYEES' RETIREMENT      )

6    SYSTEM,                    ) Section A

7              Plaintiff,       )

8                               ) Cheif Judge:

9    vs.                        ) John V. Parker

10   MMAR GROUP, INC., et al., ) Magistrate Judge:

11            Defendants.       ) Christine A. Noland

12   _ _ _ _ _ _ _ _ _ _ _ _ X

13

14            HOUSTON, TEXAS

15         Friday, January 20, 1995

16         Deposition of WILLIAM R. FINCHER, a witness

17   herein, called for examination by counsel for

18   Plaintiff in the above-entitled matter, pursuant to

19   notice, the witness being duly sworn by Julie Ann

20   Schermerhorn, Certified Shorthand Reporter in and

21   for the State of Texas, taken at the offices of

22   Morris & Campbell, 600 Jefferson, Suite 1617,

23   Houston, Texas at 9:30 a.m., and the proceedings

24   being taken down by stenotype by Julie Ann

25   Schermerhorn, and transcribed under her direction.

**ALDERSON REPORTING COMPANY, INC.**
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005



2

```
 1              A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4              MR. ALBERT W. TURNBULL

 5              Hogan & Hartson

 6              555 Thirteenth Street, N. W.

 7              Washington, D.C. 20004

 8

 9     FOR THE DEFENDANTS:

10              MR. MARK C. HARWELL

11              Morris & Campbell

12              600 Jefferson, Suite 1617

13              Houston, Texas 77002

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    I N D E X

2

3   WITNESS:        WILLIAM R. FINCHER

4   EXAMINATION:                              PAGE

5       BY MR. TURNBULL                          4

6

7             E X H I B I T  I N D E X

8   EXHIBIT NO.:                   MARKED ON PAGE

9   1    Notice of Intention to take

10       Oral Deposition of Defendant,

11       MMAR Group, Inc.                        4

12  2    Defendants' Response to Plaintiff's

13       Third Request for Production of

14       Documents                              56

15

16

17

18

19

20

21

22

23

24

25

**ALDERSON REPORTING COMPANY, INC.**
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

4

1      (An instrument was marked as

2      Exhibit No. 1 for identification and was

3      attached hereto.)

4

5           WILLIAM R. FINCHER,

6  was called as a witness by the Plaintiff and,

7  having been first duly sworn, was examined by

8  counsel and testified as follows:

9

10                  EXAMINATION

11

12  QUESTIONS BY MR. TURNBULL:

13      Q.   Mr. Fincher, my name is Albert Turnbull.

14  I'm an attorney with the law firm of Hogan &

15  Hartson, and we're representing the Louisiana State

16  Employees' Retirement System in litigation against

17  the MMAR Group and others.  And I'm here today to

18  ask you a few questions and get some information

19  from you, and that process won't work if you're not

20  able to understand the questions that I ask you.

21  So, I'll ask that at any time you don't understand

22  a question, if you will please let me know and I

23  will try and make it better so you can understand

24  what kind of information I'm seeking.  Is that all

25  right with you?

5

```
1        A.    Certainly.  Fine.

2        Q.    Could you state your name for the record,

3   please.

4        A.    William Raymond Fincher.

5        Q.    And what is your home address, sir?

6        A.    22819 Indian Ridge, Katy, Texas.

7        Q.    And your current business address?

8        A.    4544 Post Oak Place, Suite 378-B, Houston,

9   Texas 77027.

10       Q.    And who is your current employer?

11       A.    MMAR Group.

12       Q.    How long have you been employed by the MMAR

13  Group?

14       A.    I think since about 1990.

15       Q.    And in what capacity or capacities have

16  been employed by the MMAR Group?

17       A.    I headed the real estate division at the

18  MMAR Group.

19       Q.    Starting in 1990?

20       A.    Yes, sir.

21       Q.    And continuing through MMAR's -- I'll

22  characterize it as going out of business in

23  approximately November of '93.

24       A.    Yes.  That's correct.

25       Q.    And what were your responsibilities?
```

6

1     A.    I would do the diligence on real estate

2     investments, various other investments that were

3     similar to -- or real estate related, basically.

4         Q.    And what are your current responsibilities

5     with the MMAR Group?

6         A.    I've handled the investigation into this

7     lawsuit.

8         Q.    Anything else?

9         A.    I've also investigated matters in Boston,

10    and I still handle some of the real estate.

11        Q.    Is MMAR still involved in real estate work?

12        A.    MMAR's not involved in real estate; the

13    principals of MMAR are.

14        Q.    Would you characterize your current

15    employment by the MMAR Group as full time?

16        A.    Yes.

17        Q.    And could you estimates what proportion of

18    your time working for the MMAR Group has been

19    devoted to the investigation surrounding the

20    LASERS' lawsuit?

21        A.    Well, could you give me a more precise time

22    period?

23        Q.    Sure.  Let's start in November of '93.

24        A.    From November of '93 through the present

25    day?

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 25 of 112

1    Q.    Yes, sir.

2    A.    I would say probably 80 percent of my time.

3    Q.    And the remaining 20 percent devoted to the

4    other matters that you've described?

5    A.    Yes, sir.

6    Q.    Mr. Fincher, let me hand you what the court

7    reporter has marked as Deposition Exhibit 1, which

8    is a notice of deposition to the MMAR Group.  And

9    you'll see that attached to Deposition Exhibit 1 is

10   a Schedule A, an Appendix A, listing certain

11   matters as to which testimony is sought from the

12   MMAR Group.  Are you the person who's been

13   designated by the MMAR Group to give that

14   testimony?

15   A.    Yes, sir.

16   Q.    And do you consent to give that testimony?

17   A.    Yes, sir.

18   Q.    All right, sir.  Starting in November of

19   1989 and continuing through November of 1993, did

20   MMAR Group have a system in place for recording

21   conversations between it's personnel and others?

22   A.    The MMAR Group had a recording system.  I'm

23   not sure the beginning date, but it did have a

24   recording system when I came on board in about

25   1990.

8

1    Q.    Okay.  And what was that recording system?

2    A.    It was a dictaphone recording system,

3    approximately the height of an average man, I would

4    say.  There were four reels.  I brought one for

5    you.

6    Q.    Okay.  Let's break it down step by step.

7    What was the model name of the dictaphone system?

8    A.    It was like a Veritrac 9000, I believe.

9    Q.    And did that system change at all from the

10   time when you started working for the MMAR Group in

11   1990 through November of '93?

12   A.    The recording system from when now?

13   Q.    From the time when you are started working

14   at MMAR.

15   A.    Oh, no, I don't believe it changed.

16   Q.    Okay.  How did that system work?

17   A.    There were four reels.  The recording

18   system -- the top one had two large reels like this

19   (witness indicating), and then the bottom one had

20   two large reels like this (witness indicating).

21   When one system was recording, the other one

22   was on standby.  It simultaneously recorded 60

23   conversations or stations at a time.  It was

24   working from 0700 hours in the morning until 1900

25   hours at night.

ALDERSON REPORTING COMPANY, INC.

(202)289-2260 (800) FOR DEPO

1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

1    Q.   Was the maximum capacity of the system at

2    any one time 60 telephone lines?

3    A.   It was always 60 -- well, it wasn't always

4    60.  The system that was in place was 60.

5    Q.   There was some hesitation or confusion in

6    answering it.  At some time were there -- strike

7    that.

8             Did the system monitor only telephone

9    conversations?

10    A.   That's what it was set up to do, yeah.

11    Q.   Did it happen to monitor other kinds of

12    conversations?

13    A.   Yeah, sometimes, inadvertently.

14    Q.   How did that happen?

15    A.   Sometimes if would -- if somebody was very

16    close to a phone, sometimes it would pick up a

17    conversation.

18    Q.   How many phones did the MMAR Group have?

19    A.   About 100 phones, roughly.

20    Q.   Okay.  And only 60 of those were being

21    recorded at any one time?

22    A.   Yes, sir.

23    Q.   And which phones were being recorded?  Can

24    you give me a general description of what criteria

25    were used to pick the phones that would be recorded

10

1    and pick the phones that would not be recorded?

2       A.   Well, I can tell you which phones

3    approximately that were recorded:  The phones in

4    the conference rooms, the lunch room, phones at the

5    trading desk, the broker's phones.  Some of the

6    other offices had phones recorded.  I don't know

7    how it was picked.  I just know generally that most

8    of the phones were recorded.

9       Q.   Was Mr. Brown's phone recorded?

10      A.   In all this time, I have not been able to

11   locate Mr. Brown's phone.  He was all over the

12   place, so I couldn't say that he was at any one

13   station.

14      Q.   You've been looking for Mr. Brown's phone,

15   I take it?

16      A.   I've looked specifically, and I have not

17   been able to find where he ever sat in any one

18   place.

19      Q.   How have you gone about looking for his

20   phone?

21      A.   Well, I would just monitor various

22   stations, and sometimes I would pick up phone

23   conversations with Paul Brown, but it was not

24   consistently in one location.

25      Q.   And what do you mean by "monitor various

1    stations"?

2        A.    In listening to the reel, in playing it

3    back, I would push in a station and I'd listen to

4    that station, and whoever was talking, I would pick

5    up that conversation.

6        Q.    The purpose here is really to educate me

7    about how the whole system works.

8        A.    Right.

9        Q.    And what I'm seeking through my questioning

10   is really to learn if I wanted to go to the system

11   and monitor phone conversations or try to find a

12   particular phone conversation, how would I do that,

13   and how could I do that without any help from

14   anybody else?  That's what I'm seeking here.

15       A.    Okay.

16       Q.    So tell me, just generally, if you know the

17   date and time of a particular phone call that you

18   want to find, how you find it.

19       A.    If you know the date and time?

20       Q.    Yes.

21       A.    It's still going to be pretty tough.  You

22   have to assume it's been recorded.

23       Q.    Yes.

24       A.    So, if you look at long distance phone

25   records, you might be able to determine a date and

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 30 of 112

1    a time, but many times -- I've tried that.  That is

2    a very difficult task, but I've -- I've had limited

3    success in tracking phone conversations based on

4    long distance phone records.

5              Sometimes if you know the date and

6    time, you just have to hop around and hope you can

7    find it.  Okay.  So, it's a hit and miss thing.

8    Many times I've tried -- for example, I think y'all

9    provided a list of times to look at, and I had

10   intentionally looked at some of those dates and was

11   unable to find many of the conversations, or I was

12   not able to find many of the conversations that I

13   was looking for.

14       Q.   All right.  Well, let's back up just a

15   little bit.  How would you know what tape to pick

16   up to even start your search for a particular date

17   in time?

18       A.   I didn't always know.  Basically, these

19   reels, in most cases, were unmarked.  It's just

20   been a long, difficult process of trying to

21   organize them.  It was a hit and miss thing.  It

22   was pretty random.

23       Q.   Where are the reels now?

24       A.   They're at my offices at 4544 Post Oak

25   Place.

ALDERSON REPORTING COMPANY, INC.

(202)289-2260 (800) FOR DEPO

1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 31 of 112

1     Q.    And how many reels are there?

2     A.    I believe there's something over 500.

3     Q.    And is there any labeling at all on the

4     reels?

5     A.    I've done some labeling myself.  The

6     labeling -- some are labeled, some are not

7     labeled.  The ones that are labeled are sometimes

8     incorrect.  They had a bad habit of not putting

9     down the year, so that makes it difficult.  It's in

10    a very semi-organized fashion.  I've tried to put

11    it in a chronology, but it's very unreliable.

12    Q.    Was there a person at MMAR who was

13    responsible for operating this system while MMAR

14    was in business?

15    A.    It varied.  There was no one person.  It

16    was sort of a general task of many of the

17    secretaries.  In fact, my secretary was used, and

18    that's how I got involved one weekend, but

19    generally they would tell them to go in and pull

20    conversations, and it was pretty much used by most

21    of the secretarial staff.

22    Q.    What's your secretary's name?

23    A.    My secretary's name is Denise Belto.

24    Q.    Could you spell that, please.

25    A.    B-e-l-t-o.

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 32 of 112

1       Q.   And where is she now?

2       A.   She's still at the MMAR offices on Post Oak

3    Place.

4       Q.   And you said that you first got involved

5    with the taping system through your secretary?

6       A.   That's correct.

7       Q.   And when was that?

8       A.   That was early 1993.

9       Q.   And how did that come to be?

10      A.   She was instructed to go pull tapes or

11   certain conversations, and I happened to be working

12   that weekends also, and she was very frustrated

13   because she couldn't work the system.  I think at

14   one point the reel was playing backwards, and I

15   recognized that, so I got the reel turned around so

16   it was playing forwards.  The tape broke on her,

17   and I simply Scotchtaped it together.  And during

18   the course of helping her, I came across a

19   conversation related to another case called

20   Fundamental Brokers, Inc., which is a case up in

21   New York.  I mentioned this conversation to

22   Mr. Miner, and that's how I've been doing it, ever

23   since then.  That's how I got involved.

24      Q.   What conversations was your secretary

25   looking for at that point in time?

15

1    A.    I don't recall.

2    Q.    Did it have anything to do with LASERS?

3    A.    Oh, I don't believe so.

4    Q.    What period did each tape cover?  How many

5    days or hours would it encompass?

6    A.    This covers two days.

7    Q.    You're holding up one tape?

8    A.    Yes, I'm holding up one tape.

9    Q.    Okay.  Was there a person at MMAR who was

10   responsible for changing the tapes?

11   A.    Basically, anyone who was sitting down in

12   the area.  I think there was -- I don't remember

13   the girls' names, but there were several girls that

14   would change tapes when it was necessary.

15   Q.    And what did they do with the used tapes

16   when they took them off the machine?

17   A.    They were sometimes reused.  They were in

18   closets, in mini warehouses, in people's homes.

19   They were scattered everywhere.

20   Q.    You mentioned a little while ago checking

21   long distance phone records?

22   A.    Uh-huh.

23   Q.    How many long distance phone records does

24   MMAR still have?

25   A.    I don't know.  The long distance phone

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 34 of 112

1    records I got, I obtained through MMAR's general

2    counsel, Richard Schultz.  He asked me to check

3    specific conversations related to a case in New

4    York.  I had -- I can't recall ever successfully

5    finding any of the conversations he wanted me to

6    find.  I may have found one or two.

7        Q.    Have you used long distance phone records

8    in an effort to find conversations involving LASERS

9    personnel?

10       A.    I don't think so, but I'm not certain.

11   I don't recall doing that.

12       Q.    Do you still have any long distance phone

13   records from MMAR?

14       A.    I do have some that I obtained from

15   Mr. Schultz; other than that, I don't recall any

16   others.

17       Q.    Okay.  What time period do those records

18   cover?

19       A.    I don't recall.  I think it was the early

20   days of the acquisition of Fundamental Brokers,

21   Inc., though.

22       Q.    Which would have been approximately when?

23       A.    '89 or '90.

24       Q.    Do you know if the MMAR Group has any other

25   long distance phone records relating to the period

17

1  from November of '89 through November of '93?

2  A.  No.

3  Q.  You don't know?

4  A.  I don't know.

5  Q.  Let's get back to exactly how this system

6  operates and what you need to know in order to

7  operate it.  You've got a tape there in front of

8  you.  Let's assume that you think that that tape

9  might contain a conversation that you're interested

10 in listening to.  Where do you take the tape?  What

11 buttons do you push?  What do you see, and what do

12 you do to try and find that conversation?

13 A.  If I've already listened to the tape, I'll

14 generally have marked on there begins such and such

15 a date.

16 Q.  Is there a way, from listening to the tape,

17 to determine the date and time period that it

18 covers?

19 A.  From listening to the tape?

20 Q.  Well, is that --

21 A.  Yeah, you can hear people's conversations

22 and they'll tell you, you know, I'm going to

23 see such and such a movie or, you know,

24 tomorrow's -- you know, we're taking off for

25 Halloween -- I don't know -- some holiday.  So,

18

1    yeah, you can tell dates from listening to

2    conversations.

3        Q.    Is date and time information encoded by the

4    recording system in any way?

5        A.    By the recording system?

6        Q.    Yes, sir.

7        A.    Yes.

8        Q.    And how difficult or easy is it to put the

9    tape into the recording system and retrieve the

10   date and time information?

11       A.    Putting the tape in and receiving the date

12   and time, that's not difficult -- well, it is

13   difficult, but -- I don't want to say it's not

14   difficult.  It can be done.

15       Q.    Okay.  Let's say with respect to the tape

16   you have in front of you, what would you do in

17   order to determine the date and time?

18       A.    Well, I would put the reel on, and

19   I'd -- they were generally backwards, so I'd have

20   to rewind it first, not always, but generally.  And

21   at the beginning of the tape, I'd find out what the

22   time and date was of the conversation -- or the

23   beginning of that time.

24       Q.    Okay.  And how do you find that out?  Does

25   it pop up on the screen?

19

1    A.    Yes.

2    Q.    Okay.  Is this like a television screen?

3    A.    Yes.

4    Q.    What data do you see on the screen?

5    A.    You'll see 60 numbers which indicates the

6    channels.  It will sometimes show the date and the

7    time, not always.  Let's see.  It will tell you the

8    mode, the function mode that it's in, I believe.  I

9    think it also indicates where you are on the reel,

10   at what, you know, percentage of the reel has

11   passed through.

12   Q.    Anything else that you can recall?

13   A.    I've sat in front of it so long.  I can't

14   recall anything else offhand.

15   Q.    You said that sometimes, but not always, it

16   has the date and time.  More often than not does it

17   have the date and time?

18   A.    It may have the date and time, but it will

19   sometimes show the year 2005 for some reason.

20   Q.    Any idea why?

21   A.    No, I have no idea.

22   Q.    How often do those kind of phenomena occur?

23   A.    Every once in awhile, not that frequently.

24   Q.    For the tapes that have date and time

25   information encoded on them -- putting aside the

20

1   question of how long it takes to rewind the

2   tape -- how long does it take to pop a tape into

3   the machine and look at the screen and see the

4   first date and time occur?

5       A.   Let's see.  The rewinding takes about five

6   minutes, and to see the first date and time -- it

7   depends on how much they use for a feeder, to get

8   the tape going, but I'd say within a minute or two.

9       Q.   And for approximately what percentage of

10  the 500 tapes in your possession have you

11  identified date and time information?

12      A.   I don't know.  A lot.  I don't know.

13      Q.   More than half?

14      A.   No, I wouldn't say more than half.

15      Q.   Is there any reason why you haven't

16  identified date and time information for all of the

17  tapes?

18      A.   It's very time consuming.  I've spent over

19  a week on one single reel, to give you an idea of

20  how long it can take, and I've missed a lot, I'm

21  sure.

22      Q.   When you say you spent a week on one single

23  reel, can you kind of take me through the week,

24  what you did, what was your search strategy, that

25  kind of thing?

ALDERSON REPORTING COMPANY, INC.

(202)289-2260 (800) FOR DEPO

1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

21

1    A.    Most of the time that I spent looking at

2    tape was in connection with the Fundamental Brokers

3    lawsuit.

4    Q.    Okay.

5    A.    It was not uncommon to find a conversation

6    that would have -- well, let me back up a little

7    bit.

8          If one system stopped, the other one

9    picked it up, but sometimes a conversation could be

10   on two or even three reels.  In other words, it

11   would start on one reel and end up on another reel.

12   Q.    Because the tape stopped?

13   A.    Not -- well, sort of.  Unfortunately, there

14   was a bad habit of not waiting until the end of the

15   day to pull conversations, and as a result, in the

16   middle of a tape, a tape that may stop may be

17   picked up on the next reel or it may not be.  And

18   many times you'll have hello and good-bye but

19   nothing in the middle.

20   Q.    I'm not quite understanding that.  Would

21   that be because someone turned off the machine and

22   switched on another machine?

23   A.    Yeah -- well, it was the same machine, but

24   basically what would happen is a request would be

25   made to pull a tape.  Well, in order to pull that

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 40 of 112

1    conversation, if you didn't want to wait until the

2    end of the day, you'd have to stop the reel that

3    was recording. As a result, the conversations that

4    were taking place throughout the company would pick

5    up on another reel, sometimes. Unfortunately, that

6    didn't always happen. So, it would switch from

7    reel to reel. Sometimes you would find several

8    different months on one reel, and sometimes you'd

9    have 30 seconds from a single day, you know, and

10   then -- so it's all fragmented.

11       Q.   This would be -- and please correct me if I

12   get this wrong -- I'm just trying to understand how

13   this worked -- what would happen is that the tape

14   would be recording, someone would want to hear a

15   conversation on that tape, so the tape would be

16   pulled off and played back to look for the other

17   conversation, and then at some later point, it

18   would be put back on, and that's why it could

19   record widely varying dates, it could jump from one

20   day to two days later if it happened to be put back

21   on the system two days later?

22       A.   Well, it wasn't physicalled pulled of. The

23   term "pulling a tape" -- I should define that for

24   you -- the tape -- let's assume that the top reel

25   is reel is running. Let's say it's 11:00 a.m.

23

1    Somebody says, "I got to have this tape. I want it
2    right now." So they would stop that reel, and in
3    theory, the bottom reel was supposed to start
4    picking it up. A cassette would be stuck into the
5    machine, a small little regular cassette, and they
6    would go back and try to locate that conversation.
7    If they knew the station and the time, they could
8    precisely locate it. So, that would be pushed
9    in -- the tape would be put into the machine and
10   they would pull it. That's what we refer to as
11   pulling tapes. But it wasn't physically pulled off
12   the machine.

13       Q.   Is it possible to listen to a particular
14   conversation if you know the date, time and the
15   station number without copying it first onto a
16   cassette tape?

17       A.   Yes.

18       Q.   And how do you do that?

19       A.   There's a feature on the machine called
20   auto search, and if you know the -- if you have the
21   right tape, you put in the tape, you plug in the
22   date and the time, and it will go right to that
23   time, then you got to locate the station.

24       Q.   Yes. If you know the station as well, will
25   the machine go there, or do you have to search

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 42 of 112

1    somehow for the station?

2        A.    The audio -- excuse me.  The auto search

3    only goes to the time and then it stops, and then

4    it's up to you to manipulate the machine from that

5    point forward.

6        Q.    How do you go about manipulating the

7    machine to get it to a particular station?

8        A.    There is like a pad, and it has numbers on

9    it, and you punch in the numbers of that station.

10       Q.    Okay.  The numbers one through 60

11   or --

12       A.    One through 0 -- I mean -- I'm sorry.  One

13   through nine and then 0.

14       Q.    It's like a calculator pad?

15       A.    Right, it's like a calculator pad.

16       Q.    You were telling me earlier that you spent

17   as much as a week going through a single tape?

18       A.    Uh-huh.

19       Q.    Describe for me how you did that.  I mean,

20   what was your search strategy?

21       A.    Strategy?

22       Q.    Well, for example, from what I'm hearing so

23   far, I suppose what I would do is start at the

24   beginning of the tape and start on Channel 1, and

25   listen to Channel 1 through the end of the tape,

25

1  rewind the tape, start at Channel 2 and go through

2  the tape.  Is that what you did?

3      A.    That would have been nice if that's what I

4  could have done, but that's not how it was done,

5  and it couldn't have been done that way.

6      Q.    Why not?

7      A.    Well, because there were too many

8  interruptions in the tape, number one.  Number two,

9  it wasn't so much the station as the person.  I was

10 trying to locate conversations between certain

11 parties.  And people, for example, like Paul Brown

12 were all over the place.  So you never knew if he

13 was on a recorded phone or an unrecorded phone.

14 You never knew where he was talking from.  So it

15 was very difficult, for example, to locate

16 conversations with Paul Brown.  Yeah, if you could

17 take one station and go right through, that would

18 be nice, but that's not the way it was.

19     Q.    How about Rich Evans, how many stations did

20 he use?

21     A.    Rich Evans, I focused on one particular

22 station.  I don't recall offhand which one it was,

23 but I focused on one particular station where

24 his desk was, but it was common for him to

25 use -- the brokers use each other's phones, and

26

1    sometimes I'd picked his conversations up on

2    another phone or at the trading desk.

3         Q.    If you focused on one particular station,

4    why would you be listening at all to the trading

5    desk or some other station?

6         A.    Well, sometimes I felt certain there was a

7    conversation there, and I would be switching

8    around.  I'd punch in 1 through 60 stations, and

9    I'd try to find it.  I would go through a great

10   deal of effort and frustration.  I mean, I would

11   keep going back to that time.  You'd have to rewind

12   the tape, and it's a very -- it's not finely tuned

13   so you'd have to -- let's say if you think a

14   conversation takes place at 9:00 a.m., you start

15   with Channel 1, but then you got to rewind it, and

16   then you got to assume it could be off a little

17   bit, so you go through that, then Channel 2, then

18   Channel 3, then Channel 4 and so on.  So you try to

19   listen, and sometimes you get lucky and find the

20   conversation.

21        Q.    With respect to conversations involving

22   LASERS or Vernon Strickland, who told you where to

23   look?

24        A.    Nobody told me where to look.  I was just

25   told to find it.

27

1     Q.   Were you given a particular date to look

2  on, a particular time, for example?

3     A.   You mean the beginning time to look for

4  this?

5     Q.   Yes, sir.

6     A.   I don't remember the date, but I do

7  remember an event that could identify the date.

8     Q.   And what was that event?

9     A.   It was Tracy Raby's wedding.  That was the

10  first day I began pulling tapes on LASERS.

11     Q.   And approximately when did that take place?

12     A.   Sometime in '93.  I just don't recall the

13  exact date.  I would say sometime in the latter

14  half of '93.

15     Q.   First, could you spell Ms. Raby's name for

16  the court reporter?

17     A.   Not her current name; she's been married.

18  I don't know her married name.  But it was R-a-b-y,

19  Tracy Raby.

20     Q.   And did she work at MMAR?

21     A.   Yes.

22     Q.   In what capacity?

23     A.   She was a blind girl who had special

24  equipment and could take documents on this machine,

25  and it would put the whole document on a

1   word-processor-type -- I'm not that familiar with

2   it.

3       Q.   A scanner?

4       A.   Yeah, a scanner.  And she could edit -- she

5   listened to stuff, and she could edit this stuff,

6   and she had the, you know, the bumps and --

7       Q.   Braille?

8       A.   The braille.  Yeah, the braille.

9       Q.   I don't need all that detail.  I was just

10  trying to get information to identify her.

11      A.   Okay.  That's what she did.

12      Q.   Where is she now?

13      A.   I don't know.

14      Q.   And what were you told to do with respect

15  to the taping system around about the time of her

16  wedding?

17      A.   I was asked to pull conversations related

18  to -- between Rich Evans and Vernon Strickland.

19      Q.   Who asked you to do that?

20      A.   I think it was Cory Miner.

21      Q.   Did he give you any dates or times to go

22  on?

23      A.   I don't recall.

24      Q.   You don't recall whether he did, or you

25  don't recall specific dates?

29

1    A.    I'm sorry.    I should rephrase that.    I'm

2    sure he gave me an approximate date.    I don't

3    recall the specific dates I was given.

4    Q.    Did he tell you the substance of what he

5    wanted you to find?

6    A.    I generally try to understand -- yes.    I

7    think he would tell me basically -- well, I say the

8    substance.    Let me think about that.

9            No, I don't think he told me the

10   substance at first.    Just basically get

11   conversations between Vernon Strickland and Rich

12   Evans.

13   Q.    At some later date, did he tell you the

14   substance of the conversations that he was looking

15   for?

16   A.    Sometimes.

17   Q.    And what were they?

18   A.    There was a conversation between Cory Miner

19   and Tom Burbank, and he wanted me to find that, and

20   he told me the essence of what was said.

21   Q.    And did you find that conversation?

22   A.    Yes, I did.

23   Q.    And was that conversation transcribed?

24   A.    Yes, it was.

25   Q.    And was it produced to LASERS?

1     A.   Yes, it was.

2     Q.   Were there any other specific conversations

3   that you were asked to find, conversations where

4   you were told what he thought would be talked about

5   in the conversation?

6     A.   I assume there were.  I don't recall

7   offhand.  That one stands out in my mind, but I

8   can't recall any others.  I think I was given a lot

9   of liberty on what to look for.

10    Q.   Starting about the time of Ms. Raby's

11   wedding, approximately what percentage of your

12   daily work time did you devote to listening to

13   tapes?

14    A.   I was working from 6:00 in the morning

15   until past midnight.

16    Q.   For how long?  Days?  Weeks?  Months?

17    A.   Over a year.  Oh, I'm sorry.  Starting from

18   the time of Ms. Raby's wedding?

19    Q.   Yes.

20    A.   I had been doing it for the better part of

21   a year.  And I --

22    Q.   Excuse me for interrupting.  You had been

23   doing it before the wedding?

24    A.   Yes.

25    Q.   In connection with Fundamental Brokers,

31

1    Inc.?

2        A.   Yes, that's correct.  So there was an

3    overlap.  And I remember being very disappointed in

4    having to do this.  I didn't want to do it.  I was

5    already familiar with Fundamental Brokers, and I

6    didn't want to get familiar with a new subject.

7                    A big part of it is identifying voices

8    and things like this, and so it was frustrating for

9    me to make a switch.  I did a very cursory-type

10   deal and then tried to get away from it on purpose.

11       Q.   How did you try and get away from it?

12       A.   By focusing more on the Fundamental tapes.

13   I was familiar with the subject.  I had my mind

14   focused on that, and it took a great deal of

15   concentration and trying to figure things out on

16   how to -- sometimes how to find these tapes.  So,

17   it was frustrating to have to try to switch.

18       Q.   I gather, though, that you were

19   unsuccessful in getting away from the LASERS issue?

20       A.   It became -- well, initially -- no, I went

21   back to Fundamental Brokers.  I pulled a few tapes

22   just randomly, just hopped around, and whatever

23   there was, there was, and I pulled some tapes, and

24   then I went back to Fundamental Brokers.

25       Q.   And did something happen to change your

Case 4:95-cv-01262 Document 59 Filed on 01/01/96 in TXSD Page 50 of 112

1    focus after that?

2         A.    I think the first thing that happened may

3    have been an article, a pending article, in the

4    Wallstreet Journal.  I may have spent a little more

5    time on it as a result of that, trying to find

6    conversations.  Once the Wallstreet Journal article

7    came out, which was, I believe, in October of 1993,

8    the focus became almost entirely on LASERS.

9         Q.    And since that time, since the time that

10   article came out in approximately October of '93,

11   what percentage of your daily working time has been

12   devoted to reviewing tapes for information relating

13   to LASERS?

14        A.    In the beginning, 100 percent virtually.

15        Q.    For what period of time was it 100

16   percent?  And thereafter, how did it change?

17        A.    I would say 100 percent in the beginning of

18   1994, and after·having been through an entire year

19   of working with no vacation, only two weekends off

20   in a year, and 60 to 20 hour days, I had had

21   enough.  So I just decided this is it.  I'm cutting

22   back.  So it would be -- when you say percentage of

23   my daily work time, I'd say the hours lessened

24   dramatically, but it was still a large part of my

25   daily work routine for a few months.

Case 4:95-cv-01262  Document 59  Filed on 01/31/96 in TXSD  Page 51 of 112

1      Q.   Ending in approximately when?

2      A.   It's never really ended, I guess.

3   Occasionally, I've been -- as recently y'all

4   requested, I was asked to go back and make some

5   searches, and I did some preliminary search, but it

6   still goes on to a small degree.

7           You know, occasionally I'm asked to go

8   back and try to find something.

9      Q.   Are you currently looking for any tape,

10  tape conversations involving LASERS?

11     A.   Any specific conversations, no.

12     Q.   Are you currently reviewing tapes generally

13  for conversations involving LASERS?

14     A.   No, except -- the most recent request was

15  y'alls as far as LASERS goes now.  Now, there

16  was -- there have been other requests, but they're

17  unrelated to LASERS.

18     Q.   We were talking a little while ago about

19  the visual display this dictaphone machine gives

20  you, and you mentioned something about the function

21  mode.  What's that?

22     A.   Well, it has several different functions:

23  Of course, fast forward and rewind.  You can do

24  that on two different control panels.

25     Q.   Excuse me for interrupting.  Why two

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 52 of 112

1      different panels?  One for each tape?

2      A.    You got me.  I haven't figured that one out

3      myself.  That's just the design on the machine.

4      Q.    But they're equivalent panels?

5      A.    You've got two fast forwards.  You know,

6      there's a button, and then there's like a pad you

7      can press.  Why they did it that way, I don't

8      know.  There's two rewinds.  Then when you put it

9      into this function mode, you can put it into other

10     various functions.

11     Q.    Like what?

12     A.    I'd say auto search is one mode, where if

13     you know the precise day and time, you can use auto

14     search.

15           Then there's audio search, which is a

16     different function.  And what that does is it is

17     intended to move forward to the next conversation.

18     Q.    On the particular channel?

19     A.    Well, yes.

20     Q.    Any qualification to that?

21     A.    It doesn't work that well.  None of the

22     features work that well, because unfortunately

23     you've got too many problems.  You've got time

24     changes, so if you put it on auto search, you could

25     be off, and there's been a time change and the

35

1   machine didn't necessarily -- didn't automatically

2   change, so it could be an hour off.

3            Another problem with that is the audio

4   search feature generally doesn't work well, and so

5   I've learned to tell -- sometimes I use it, but

6   I've learned to tell when I -- sort of when I can

7   use it and when I can't use it.

8        Q.   And what's your methodology there?

9        A.   It varies.  It depends on the amount of

10  noise on the channel.  It depends on -- you know,

11  sometimes you get static on a line, and it will

12  stop for static.  And sometimes it will miss

13  conversations.

14           My methodology?  If I stop and I'm

15  listening to a conversation or I don't -- but if it

16  stops on a conversation and Mr. Evans is, say,

17  talking to his wife, I'll usually try to go through

18  that; but unfortunately, it doesn't -- he may be

19  talking to his wife, and then he'll get a call, and

20  he'll pick up the call in the middle of a

21  conversation, and you'll miss that call entirely

22  because it goes through that until it gets to the

23  next conversation, which is usually static or noise

24  or something else.

25       Q.   In other words, it's intended to search for

36

1    silences on the tape, and it skips through silences

2    until the next noise, and then it stops?

3        A.    It's intended to search for sound.

4        Q.    Yeah, I had it backwards.

5              There have been produced in the

6    LASERS' litigation a number of transcripted tapes

7    beginning with the dates number, M-M-A-R, multiple

8    zero, number one, and continuing through

9    approximately 1054, and subsequent transcripts have

10   been produced since that time.

11             Can you tell me how it was that those

12   transcripts came to be made?

13       A.    Yes.   I had a large box that I threw the

14   tapes in and --

15       Q.    Let me interrupt for just a second.   By

16   "threw the tapes in," are you talking about the

17   large, round reel to reel tapes?

18       A.    No, no.   The copies, the cassettes.   And we

19   hired a bunch of temps to come in and start

20   transcribing them.

21       Q.    And the temps that you hired transcribed

22   each and every one of the cassette tapes that you

23   gave them?

24       A.    No.   Unfortunately, that didn't quite -- a

25   large percentage -- well, I shouldn't say a large.

Case 4:95-cv-01262  Document 59  Filed on 01/31/96 in TXSD  Page 55 of 112

1    I should say a significant percentage of the tapes

2    just wouldn't copy for some reason.  I could hear

3    it on the reel, but when I went to copy it, it

4    didn't come out on the cassette.  And it might be

5    reel faint, but they would say that they just

6    simply couldn't hear it.  And I never -- in most

7    cases, I think I went back once or twice and tried

8    to copy, and for some reason it didn't copy.  But

9    there are quite a few that just didn't get

10   transcribed because they were inaudible.

11       Q.    They were inaudible on the cassettes, but

12   audible to you on the reel to reel tape?

13       A.    Yes.

14       Q.    Which was why you pulled them and tried to

15   copy them on the cassette in the first place?

16       A.    Correct.

17       Q.    Were any transcripts made directly from the

18   reel to reel tapes?

19       A.    Directly from the reel to reel?  No, never.

20       Q.    In other words, I guess there were no

21   conversations that you heard on the reel to reel

22   tape and that you felt should have been copied and

23   were copied onto the cassette tapes that you

24   believed were important enough to be transcribed

25   directly from the reel to reel tape when it turned

1 out the copy was inaudible?

2  A. Well, as far as importance, certainly -- in

3 most cases, importance wasn't a factor. It was

4 just whether or not there was a conversation. So,

5 let me go back and clarify that. If I heard a

6 conversation, I simply recorded it. Sometimes I

7 did make specific efforts, as I said, in the

8 situation with Mr. Burbank and Mr. Miner.

9      I'm sorry. Now, what was the rest of

10 your question again? I wanted to clarify that.

11  Q. I may be making assumptions that are

12 unfounded, but I'm assuming -- and please correct

13 me if I'm wrong -- that if you took the trouble to

14 make a copy of what you heard on the reel to reel

15 tape, you thought that for whatever reason this was

16 a conversation that someone should review and that

17 should be transcribed. And so, if it turned out

18 that the cassette was inaudible, it seems to me, if

19 I were doing the research, that I would then have

20 the transcriber go directly to the reel to reel

21 machine and try and transcribe what I heard from

22 the reel to reel machine.

23      Is there any reason why you didn't do

24 that or why you wouldn't do that or couldn't do

25 that?

39

1    A.   Well, the assumption is incorrect.  As I

2  said, it's not related to importance.  If there was

3  a conversation, I would generally copy it.

4            Now, in the situation with Fundamental

5  Brokers, Mr. Clemmons wanted every single

6  conversation recorded regardless.

7    Q.   Who was Mr. Clemmons?

8    A.   He represents MMAR Group in a lawsuit

9  against Proscower, Rose, Getts and whatever in New

10  York.  He wanted every one as I came to it

11  regardless.  That's where most of the time was

12  spent.  So it had -- it certainly had nothing to do

13  with importance.  Sometimes someone would call and

14  leave a message; I'd copy the tape.

15            In·the situation with LASERS -- and

16  since I had no specific instructions -- I tried to

17  pretty much limit it to conversations where there

18  was a conversation generally between Mr. Evans and

19  Mr. Strickland, and that was the basis for the

20  copying.

21    Q.   If a temp comes to you with a cassette and

22  says, "I can't hear what's on this, I can't

23  understand it," it is possible for you, using

24  information written on the cassette or recorded on

25  the cassette in some way to go back and retrieve

ALDERSON REPORTING COMPANY, INC.

(202)289-2260 (800) FOR DEPO

1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

40

1   relatively easily the conversation from the reel to

2   reel tape?

3       A.   Yeah.   I think I tried that a few times,

4   but in most cases I did not.

5       Q.   When did you try to do it?

6       A.   When I first realized there was a problem

7   with the system and that it just wouldn't copy or

8   didn't copy very well certain -- at first, I

9   thought it was just a defective cassette, but then

10  I began to realize that sometimes it just wouldn't

11  copy onto the cassette for some reason, or didn't

12  copy very well.

13      Q.   Were you able to go back and hear the

14  conversation on the reel to reel tape when you did

15  try?

16      A.   I remember trying to recopy some.   I think

17  I was unsuccessful in recopying, and so I just

18  assumed it just couldn't be done, and I just moved

19  on.   I was too busy to worry about recopying tapes,

20  for the most part.

21      Q.   Did you ever try and go back and listen to

22  those uncopyable conversations and determine if

23  there was anything of interest that would warrant

24  trying to make a direct transcription from a reel

25  to reel tape?

Case 4:95-cv-01262 Document 59 Filed on 01/31/96 in TXSD Page 59 of 112

```
1        A.    Not that I recall.

2        Q.    Do you have an idea of approximately what

3    percentage of the LASERS-related-conversations that

4    you tried to copy were not transcribable?

5        A.    What percentage?

6        Q.    Yes, sir.

7        A.    I hate to give you a percentage.  I would

8    say 5 percent.

9        Q.    A relatively small percentage were not

10   copyable?

11       A.    Yes, sir, that's correct.

12       Q.    Okay.  Were there any tapes -- strike

13   that.

14             Were there any conversations that were

15   copied that you decided or that you were told not

16   to transcribe?

17       A.    Not to transcribe?

18       Q.    Yes, sir.

19       A.    No.

20       Q.    Have you ever made any tapes for Mr. Miner

21   or Mr. Brown or for MMAR's lawyers, tapes that

22   involve conversations with respect to LASERS that

23   were not transcribed?

24       A.    Tapes that were not transcribed?

25             MR. HARWELL:  Well, I instruct the
```

42

1    witness not to answer to the extent that he's
2    attempting to invade the attorney-client privilege.
3        Q.    (By Mr. Turnbull)  Let me go back and
4    explain what I'm trying to get at.  We've been told
5    that it's very difficult to retrieve particular
6    conversations and it's very time consuming to
7    transcribe them.  And I think we're entitled to
8    know if there are any conversations out there that
9    may have some relevance to the lawsuit that, for
10   whatever reason, you know the substance of the
11   conversation, but have not been transcribed.
12       A.    Let me try to go back and clarify that.
13   You covered a lot of area there.  As far as
14   relevance goes, again, that was not necessarily the
15   criteria.  Certainly in the beginning, I used this
16   large system, and I was working late at night, and
17   I would turn the volume up real high, just
18   basically so I could tell when the conversation
19   ended, and I'd go into the kitchen and start fixing
20   myself a sandwich, in the MMAR kitchen.  So I
21   wasn't even paying attention to many of these
22   conversations.  They were just simply being pulled
23   and copied.  So relevance was not necessarily a
24   factor.  In fact, it generally wasn't a factor.
25               As far as not transcribing tapes, the

43

1    only thing I can think of would be tapes just

2    didn't copy.

3        Q.   So you have never been told by anyone who

4    has heard a conversation that's been recorded, "Do

5    not make a transcript of that conversation"?

6        A.   No.

7        Q.   Have you ever been instructed by anyone not

8    to listen for conversations on particular days?

9        A.   No.

10       Q.   You were talking earlier about having hired

11   a number of temporaries to make transcripts of

12   tapes.  When did that take place?

13       A.   I think sometime around October of

14   1993 -- well, no.  It may have been before that.

15   All I can say is sometime in 1993.

16       Q.   And approximately how long did that take

17   place?

18       A.   For most of the year and probably -- yeah,

19   most of the year and probably into the next year.

20       Q.   How many temporaries were used?  Let me

21   clarify that question.

22            How many temporaries were working at

23   any one time?

24       A.   I think there was as many as six at a time.

25       Q.   And for approximately how long were six

1    temporaries working?

2        A.    I don't recall.

3        Q.    Do you know how much it cost to have these

4    transcripts made?

5        A.    No, sir.

6        Q.    Do you have any rough ballpark figure of

7    how much it cost?

8        A.    No, sir.

9        Q.    Is there a manual for this dictaphone

10   machine that you were using?

11       A.    Yes, sir.

12       Q.    And do you still have that manual?

13       A.    Yes, sir.

14       Q.    And how thick is it?

15       A.    It's probably about that thick I guess

16   (witness indicating).

17       Q.    Did you find it useful in figuring out how

18   the system worked?

19       A.    No, I never used the manual.

20       Q.    You and a lot of people.

21       A.    Yeah.

22       Q.    If I wanted to go and use the dictaphone

23   system to listen to particular conversations, is

24   there any reason why I should do that sooner rather

25   than later?  Is the machine breaking down?  Is the

45

1    machine going to be sold?  Anything in the

2    immediately foreseeable future that could happen to

3    prevent me from using it to listen to tapes?

4        A.    You mean the machine where the recording

5    was done?

6        Q.    The dictaphone machine that generated the

7    reel to reel tapes.

8        A.    That machine is no longer around.

9        Q.    What machines are you using to listen to

10    the reel to reel tapes, like the one that you have

11    in front of you?

12        A.    There's a version of about half, maybe 30

13    percent, the size.  It's just two reels, and it's

14    strictly a playback machine.

15        Q.    And what is the brand name and model number

16    of that machine?

17        A.    I don't remember the model number, but it's

18    a dictaphone.

19        Q.    Is there any other system that you know of

20    that can play back these inch-thick reel to reel

21    tapes?

22        A.    No, sir.

23        Q.    It has to be a dictaphone machine?

24        A.    I don't know if has to be; I'm just not

25    aware of any others.

**ALDERSON REPORTING COMPANY, INC.**

(202)289-2260 (800) FOR DEPO

1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

46

1      Q.    Is there anything in the foreseeable future

2   that's going to happen to the machine that you've

3   been using and that you still have to listen to

4   these tapes?

5      A.    Well, it does need servicing occasionally.

6   I mean, you play a lot of tapes, and the heads get

7   dirty.  They have to be cleaned every once in

8   awhile.  Sometimes something stops up.

9   So --

10      Q.    But other than routine maintenance, this

11   playback machine's not going anywhere?

12      A.    That's correct.

13      Q.    How about the tapes that you mentioned, the

14   500 or so reel to reel tapes, are they secure?  Are

15   they going anywhere in the immediate future?

16      A.    I believe most of them are in the office.

17      Q.    Where are the rest?

18      A.    Well, I'm not certain.  There was a

19   break-in at our office, and they did specifically

20   break into the cabinets.  There's three large

21   cabinets where the tapes are kept.  The cabinets,

22   the locking devices, were destroyed.  Somebody used

23   some sort of a crowbar.  The police came in and did

24   their fingerprinting thing, and there may be some

25   tapes missing.

**ALDERSON REPORTING COMPANY, INC.**
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

47

```
 1      Q.   When did the break-in take place?

 2      A.   A month or two ago.

 3      Q.   Have you ever ascertained for certain

 4   whether any tapes were taken?

 5      A.   No, sir.

 6      Q.   Was a police report filed?

 7      A.   Yes.

 8      Q.   Have you ever seen a police report?

 9      A.   I think I may have.

10      Q.   Do you have a copy of it?

11      A.   No, sir.

12      Q.   Do you know if MMAR has a copy of it?

13      A.   I think somebody at MMAR, my secretary, may

14   have a copy.

15      Q.   And I'm sorry.  Your secretary's name

16   again?

17      A.   Denise Belto.

18      Q.   This would be the Houston Police?

19      A.   Yes.

20      Q.   Do they have any suspects?

21      A.   I don't know.  Not that I'm aware of.

22      Q.   Do you have any suspects yourself?

23      A.   Well, it could be somebody from LASERS.

24           MR. HARWELL:  Do you have any of our

25   tapes?
```

48

1          MR. TURNBULL:  No, sir, we do not.

2          MR. HARWELL:  Then you're off the

3     list.

4     Q.   (By Mr. Turnbull)  Do you have any

5     evidence, as you sit here today, that points to any

6     particular individuals or entities as suspects in

7     this break-in?

8     A.   I can't say anyone specific.

9          MR. HARWELL:  Let me clarify.  We

10    don't know if a tape was taken.  We just don't

11    know.

12    A.   We just know there was a break-in, period.

13         MR. HARWELL:  There was a break-in.

14    Somebody broke into those cabinets.  It could have

15    been a thief looking for a computer.  We don't know

16    if he took some of them, the tapes, or he left them

17    all.  We just don't know.

18    A.   I can tell you they didn't take the petty

19    cash.

20    Q.   (By Mr. Turnbull)  Putting aside any tapes

21    that may or may not have been taken in the

22    break-in, are all of the remaining tapes in your

23    offices now?

24    A.   Yes, sir.

25    Q.   And so far, as you know right now, they're

49

1    not going anywhere in the foreseeable future; is

2    that correct?

3        A.    Yes, sir, that's correct.

4        Q.    Do you know --

5        A.    Well, let me clarify that.

6        Q.    Please do.

7        A.    When you say all of the remaining tapes,

8    the tapes that I'm aware of now, it wasn't that

9    long ago that in going through some warehouses, we

10   found some additional tapes.  So it's possible

11   there are other tapes that have not yet been found,

12   but all the tapes that I'm aware of are in my

13   possession.

14       Q.    When did you find additional tapes in the

15   warehouses?

16       A.    Oh, six or eight months ago.

17       Q.    Where are the warehouses?

18       A.    There are two.  One's on Skyline, and one's

19   on Ronda Lane.

20       Q.    Here in Houston?

21       A.    Yes, sir.

22       Q.    What's in the warehouses generally?

23       A.    Furniture, furnishings, old furnishings

24   from MMAR Group, things like that.

25       Q.    Why did you happen to be looking at the

Case 4:95-cv-01262 Document 59 Filed on 01/01/96 in TXSD Page 68 of 112

1   warehouses when you found these additional tapes?

2       A.   That's one of the things I do, I handle

3   Cory's and Paul's real estate, and this is real

4   estate that belongs to them.  I don't believe

5   the -- I don't recall the exact situation.

6   Actually, I don't think I was the one to discover

7   them.  I didn't discover them.  The people that

8   were moving stuff around discovered them and

9   brought them to my attention.

10      Q.   Had they been told to look for tapes?

11      A.   No, that wasn't the purpose at all.  It was

12  simply we were trying to accommodate a new tenant,

13  and we had to squeeze in, and they discovered them.

14      Q.   Have you reviewed any of these other tapes

15  that you found?

16      A.   I think I may have reviewed some.

17      Q.   Did you find any conversations involving

18  LASERS?

19      A.   I believe I reviewed them for Fundamental

20  Brokers.  They are very old tapes as I recall.

21      Q.   Mr. Fincher, do you know why it was that

22  MMAR had a taping system in the first place?

23      A.   My understanding is that sometimes people

24  would renege on a trade perhaps, or there would be

25  a question about a price.  So it was for the

51

1    purpose of verifying an agreement.  Sometimes there

2    was a misunderstanding, and these were very large

3    transactions, so they needed immediate

4    clarification sometimes.

5         Q.    Do you know if the system was ever used for

6    that purpose that you've just described?

7         A.    That was the primary purpose.

8         Q.    Did it work well for that purpose, so far

9    as you know?

10        A.    I suppose.

11        Q.    Here's the question that puzzles me, and

12   that is:  If you have a taping system to record

13   conversations involving a lot of money --

14        A.    Right.

15        Q.    -- why in the world aren't you able to go

16   back and retrieve those conversations quickly,

17   especially if you need to?

18        A.    Well, if you did it immediately, it was

19   very easy to do.  If you waited several years, it's

20   rather difficult.

21        Q.    And why was it easy to do it immediately?

22        A.    Because it was on the system.  They just

23   went straight there.  Somebody would come in and

24   they'd say, "Here's the time, here's the date,

25   here's the station."  They were instructed to make

52

1     requests immediately because it was thought to be

2     virtually impossible to recover these later.   In

3     fact, as I recall, Cory Miner had once made a

4     request to go back significantly into time, and was

5     told it simply couldn't be done.

6         Q.   Can you give me some details about when

7     that happened, why that happened, and so forth?

8         A.   I don't remember the specifics.  I just

9     remember that that was the belief of many of the

10    people that were at MMAR, including Mr. Miner, and

11    the people who operated the system on a day-to-day

12    basis.

13        Q.   Was that belief written down anywhere?

14        A.   Was it written down?

15        Q.   Any written instructions, for example,

16    given to the brokers if you --

17        A.   Yeah, I think there were instructions to

18    say, "Look, if you want something, you need to ask

19    for it right away."  I believe there was a memo out

20    to that effect.

21        Q.   Who wrote that memo?

22        A.   I may have.  I don't recall.  Or it may

23    have been Annette Cooper.

24        Q.   Annette Cooper?

25        A.   Uh-huh.

53

```
1       Q.    Who is she?

2       A.    She was an employee at MMAR.

3       Q.    And during what time frame did she work for

4    MMAR?

5       A.    I don't recall.  She was there until the

6    end.

7       Q.    And what was her position with MMAR?

8       A.    I don't recall her title, but one of the

9    things she did was she would handle requests to

10   pull tapes, and she had told me as well as Cory

11   Miner that you can't -- you can only go back to

12   recent tapes.  You can't go back any further.

13      Q.    Do you have any idea where that memo is

14   today?

15      A.    I think I could probably get my hands on

16   it.

17      Q.    Would it be difficult for you to find it?

18      A.    I don't think so.  I think I could find it

19   for you.

20            MR. TURNBULL:  Could I make a request

21   for that memo?

22            MR. HARWELL:  Sure.

23      Q.    (By Mr. Turnbull)  Do you know where

24   Ms. Cooper is today?

25      A.    No.
```

54

1      Q.    When did her employment with MMAR

2    terminate, if it's terminated?

3      A.    It terminated when MMAR -- around October

4    or November of '93.

5      Q.    And she lived in Houston at that time?

6      A.    Yes, sir.

7      Q.    Any reason to believe she's not still in

8    Houston?

9      A.    No, sir.

10          MR. TURNBULL:  Let's take a quick

11   break.

12

13          (Off the record.)

14

15          MR. TURNBULL:  Let's go back on the

16   record.

17     Q.    (By Mr. Turnbull)  You told me earlier

18   about the need to act quickly to retrieve tapes

19   with respect to particular transactions, and I

20   think you said that the brokers were instructed to

21   give the exact time of the conversation they

22   wanted; is that correct?

23     A.    Yes, sir.

24     Q.    How would they know the time of the

25   conversation?

55

1      A.   Well, generally, they would just hang up

2    the phone or they'd get a call and they'd say,

3    "There's some dispute over this."  It was

4    generally -- and I would say in almost every

5    instances or instances, they simply just got off

6    the phone and went over and said, "Please pull the

7    tape."  So it was pretty easy to identify the time.

8      Q.   Well, again, I'm going to make certain

9    assumptions, and please correct me if I'm wrong.

10   It would seem to me that this kind of a dispute

11   about a trade would not arise immediately.  That is

12   to say, there'd be a conversation with respect to a

13   particular transaction, and then at some later time

14   the customer would say, "Wait, this isn't what I

15   agreed to buy."

16     A.   I don't think that's correct.  I think the

17   dispute would arise immediately because

18   there's -- I think they fax sort of a conformation,

19   so generally it came up right away.

20     Q.   But it would be fair to assume, would it

21   not, that some period of time would elapse between

22   the conversation where the trade did or did not

23   take place, the faxing of the confirmation and the

24   word back from the customer that, "Wait, this isn't

25   what I agreed to do"?

56

1    A.    I assume that's correct.

2    Q.    Then how would the broker know exactly to

3    tell you exactly what time the first conversation

4    took place?

5    A.    I assume they kept their own records.  I

6    mean, I can't answer that.  I don't know.  They're

7    the ones that had to tell.  There were times when

8    they wouldn't find the conversations even though it

9    was in the same day.

10   Q.    Do you have any examples of that that you

11   recall now?

12   A.    No, I didn't do that.

13   Q.    Who did?

14   A.    I don't know.

15         MR. TURNBULL:  Let me mark this as

16   Exhibit 2, please.

17

18         (An instrument was marked as

19         Exhibit No. 2 for identification and was

20         attached hereto.)

21

22   Q.    (By Mr. Turnbull)  Mr. Fincher, I'm handing

23   you what the court reporter has marked as

24   Deposition Exhibit 2, which is Defendants' Response

25   to Plaintiff's Third Request for Production of

57

1    Documents in the LASERS case. And if you flip back

2    about three pages, there's a document there

3    entitled "Affidavit of William R. Fincher." Is

4    that your signature at the end of the affidavit?

5       A.   Yes, sir.

6       Q.   And did you draft this affidavit yourself?

7       A.   No, sir. I believe MMAR's attorneys did.

8       Q.   Do you agree with everything that's said in

9    the affidavit?

10      A.   Well, why don't you give me a moment and

11   I'll read it just to double-check.

12      Q.   Sure. Take your time.

13      A.   Okay. At the bottom of Page 2, I might

14   have a problem with the word "relevant." It would

15   simply locate the next conversation. I suppose by

16   relevant, it would simply mean the next -- it's

17   supposed to locate the next conversation. The

18   machine can't distinguish the difference between a

19   relevant and an irrelevant conversation.

20      Q.   (By Mr. Turnbull) Okay.

21      A.   I would say this affidavit is correct with

22   the exception that I noted.

23      Q.   Mr. Fincher, we've covered a lot of the

24   things that are talked about in this affidavit

25   today. As you read through it, did the affidavit

58

1    refresh your recollection about anything that you

2    testified to earlier that you'd like to expand

3    upon?

4        A.    Well, you asked me something, a general

5    question, I believe, about what the system did.

6    One of the things that it does do, as noted in my

7    affidavit, is sometimes, not every time, but

8    sometimes if there is a conversation taking place

9    on a specific station, it will get bolder.  That's

10   sometimes.  That's not every time.

11       Q.    The display screen?

12       A.    The display screen, that's correct.  So

13   you'll see these bold, maybe 20 or 30 bold numbers

14   at one time, and they're not constantly bold.

15   They're flickering at all times.  And the concept

16   there is you can play the whole tape and look at

17   the screen, and if it works perfectly, you'd see a

18   channel number go bold; you could then go back a

19   little bit, tuned to that particular channel, and

20   ideally you'd hear a conversation.  It may help you

21   to identify a conversation.  Unfortunately, it

22   didn't quite work that way.

23       Q.    What happens?

24       A.    What happens is that, as I've also noted in

25   here, if somebody is standing too close to a phone

59

1    or if there's a noise for any reason or static in

2    the line, it won't work.  I think for a long time

3    there was one particular line that was constantly

4    lit.  Well -- and it had this large humming sound

5    on there which was just a defective phone line, so

6    you can't go by that.

7        Q.   You mentioned one thing that could mess it

8    up would be someone standing too close to the

9    phone.  Would this be while the phone was on the

10   hook and no telephone conversation was taking

11   place?

12       A.   Yes, sir.

13       Q.   I should have -- I have to assume that's

14   correct.  I wasn't there.  I can only go by my

15   assumption.

16       Q.   As you've reviewed these tapes, have you

17   heard conversations where it was obvious to you

18   that it wasn't a telephone conversation, it was

19   just a couple of people talking next to a hung up

20   phone?

21       A.   I think I recall some calls like that.

22       Q.   Did the people who worked for MMAR know

23   that that could happen?

24       A.   I don't know what they knew.

25       Q.   Was there ever any disclosure to MMAR

ALDERSON REPORTING COMPANY, INC.
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

60

1    personnel about the existence of this recording

2    system and what it would and would not record?

3        A.    What it would and would not record, I'm not

4    aware of that.  I don't know.

5        Q.    Well, for example, did MMAR personnel know

6    that their telephone conversations were being

7    recorded?

8        A.    I assume so.

9        Q.    Why do you assume that?

10       A.    I believe there was some sort of memo put

11   out, or I think it was -- perhaps it may have been

12   an employment form that acknowledges that their

13   telephone conversations were subject to being

14   recorded.

15       Q.    Do you know if that form exists today?

16       A.    I don't know.

17       Q.    Did you ever sign such a form yourself?

18       A.    I don't recall.  I may have.

19       Q.    Were there any telephone at MMAR that

20   brokers knew would not be recorded?

21       A.    Yes -- well, I -- you're asking me to

22   assume that I know what they knew.  There was a

23   phone in the lobby, and I don't believe that phone

24   was recorded, and I think most people were aware of

25   that.

61

1    Q.    Have you ever heard of an instance in which

2    someone who did not want a particular phone call to

3    be recorded went out to the lobby and used that

4    phone instead of the phone at his or her desk?

5    A.    Where a person didn't want a call

6    recorded?  No, I've never heard of anything like

7    that.

8    Q.    This dictaphone recording system, did it

9    have the the capability to permit someone to

10   monitor live telephone conversations, if they so

11   chose?

12   A.    I think so.  Yes, I believe it did.

13   Q.    Do you know if that feature was ever used?

14   A.    Intentionally, I don't know.  I know that

15   I'd pass by when conversations were being pulled

16   and you could -- if they were recording, they would

17   be looking for a channel, it would bring up on the

18   speaker the live or the conversation going on at

19   that time.  I believe that's correct.  I'm not 100

20   percent sure about that.

21   Q.    Were you ever around, for example -- strike

22   that.

23          Did you ever hear someone say, "Joe's

24   having a customer conversation with Customer X, I

25   think you ought to go listen in live at the

62

1   Veritrac machine"?

2       A.   No.  I wasn't involved in that sort of

3   stuff.  I was involved in real estate during most

4   of this period.

5       Q.   Did you ever hear of that kind of thing

6   happening?

7       A.   Not that I recall.

8       Q.   You mention on Page 3 of the affidavit at

9   Paragraph 5, the end of Paragraph 5 which ends on

10  Page 3, that conversations might also be located on

11  the channel for the lunchroom and conference rooms?

12      A.   Correct.

13      Q.   Are they talking about the telephones in

14  those rooms, or was there a general microphone?

15      A.   No, just the telephone.

16      Q.   And the public address system, was there a

17  microphone attached to the public address system?

18      A.   No.  But if someone's on the phone and the

19  receptionist would say, "Cory Miner, you have a

20  call on whatever," you could hear them say that,

21  being recorded on the phone.

22      Q.   In Paragraph 6 of the affidavit, on Page 3,

23  you estimate that it would take one person working

24  full time approximately nine months to do a certain

25  kind of review that's described in the paragraph.

63

1     How did you compute that number?

2          A.    You have 60 channels, 24 hours of

3     conversation in the system.  Mathematical

4     calculation, you just sit there and listen to each

5     one, each channel one at a time, and go through it.

6          Q.    I think you say in the affidavit that

7     each -- strike that.

8                We were talking earlier, Mr. Fincher,

9     about tapes that you pulled, meaning cassette tape

10    copies of conversations on the reel to reel tapes,

11    some of which you were able to transcribe and some

12    of which you were not able to transcribe.  What's

13    the volume of those cassette tapes that contain

14    conversations respecting LASERS?

15         A.    The volume?  You mean the number?

16         Q.    How many are there?

17         A.    How many tapes are there?

18               MR. HARWELL:  You have them all.

19    We've produced every one of them to you.  We've

20    given you the tapes, I know, because I personally

21    put them in boxes and sent them to George on an

22    audio cassette that we have.

23               MR. TURNBULL:  Off the record.

24

25               (Off the record.)

64

1          MR. TURNBULL:  Let's go back on the

2    record.

3          Q.   (By Mr. Turnbull)  Mr. Fincher, we have a

4    number of transcripts that have been produced to us

5    by MMAR.  Where are the tapes from which those

6    transcripts were made?

7          A.   Generally, the tapes are in a folder along

8    with the transcript of the conversation.

9          Q.   Okay.  What about the tapes from which no

10   transcripts were made?

11         A.   I don't know.

12         Q.   Do you know if they were kept?

13         A.   I don't know.

14         MR. TURNBULL:  Let's go off the record

15   for a break.

16

17              (Off the record.)

18

19         MR. TURNBULL:  Let's go back on.

20         Q.   (By Mr. Turnbull)  Mr. Fincher, if you

21   narrow your search and listen only to a particular

22   channel, let's say you picked a channel where Rich

23   Evans was recorded most frequently --

24         A.   Yes.

25         Q.   -- and you were given a number of -- let's

1  say you were told to look for a conversation on a

2  particular day, how long would it take you to

3  review the tape for conversations involving Evans

4  on that channel on that day?

5     A.   Depends on the day.

6     Q.   Why is that?

7     A.   Some days you'll have a few minutes from

8  the entire day.  Sometimes you'll have one day

9  spread out on a several tapes.  So it just

10  depends.

11           Very rarely do you have an entire day

12  on one tape.  It's usually -- I don't want to say

13  very rarely, but I'd say less than 50 percent of

14  the time you have a conversation that goes for the

15  entire day.

16           MR. HARWELL:  You mean a tape?

17     A.   I'm sorry.  A tape that goes for the entire

18  day.

19     Q.   (By Mr. Turnbull)  And this would be

20  because at some point during the day the machine

21  was switched to the other tape?

22     A.   Or if somebody wanted a tape pulled.

23     Q.   Okay.

24           MR. TURNBULL:  Thank you for your

25  time, Mr. Fincher.

ALDERSON REPORTING COMPANY, INC.

(202)289-2260 (800) FOR DEPO

1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

66

1     MR. HARWELL:  I have no.

2          (Deposition concluded at 11:30 a.m.)

3

4

5

6

7     _____

8     WILLIAM R. FINCHER

9

10    THE STATE OF TEXAS    )ss:

11    COUNTY  OF  HARRIS    )

12

13         SUBSCRIBED and sworn to before me, the

14    undersigned authority, this _____ day of

15    _____, 1995.

16

17                    _____
                       Notary Public
18                     State of Texas

19

20

21

22

23

24

25

**ALDERSON REPORTING COMPANY, INC.**
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

67

```
 1   STATE   OF   TEXAS   :        TAXABLE COST:_____
                                   PAID BY:_____
 2   COUNTY OF HARRIS    :        BAR NO._____

 3

 4              I, Julie Ann Schermerhorn, a Certified

 5   Shorthand Reporter in and for the State of Texas,

 6   do hereby certify that the facts as stated by me in

 7   the caption hereto are true; that the above and

 8   foregoing answers of the witness, WILLIAM R.

 9   FINCHER, to the interrogatories as indicated were

10   made before me by the said witness after being

11   first duly sworn to testify the truth, the whole

12   truth and nothing but the truth, and same were

13   reduced to typewriting under my direction; that the

14   above and foregoing deposition as set forth in

15   typewriting is a full, true and correct transcript

16   of the proceedings had at the time of taking said

17   deposition.

18              I further certify that I am not, in

19   any capacity, a regular employee of the party in

20   whose behalf this deposition is taken, nor in the

21   regular employ of his attorney; and I certify that

22   I am not interested in the cause, nor of kin or

23   counsel to either of the parties.

24

25
```

**ALDERSON REPORTING COMPANY, INC.**
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

68

1            Given under my hand and seal of office

2    on this _____ day of _____, 1995.

3                    _____

4                    Julie Ann Schermerhorn, CSR, RPR

5                    No. 5072, Expires 12-31-95

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALDERSON REPORTING COMPANY, INC.
(202)289-2260 (800) FOR DEPO
1111 14th ST., N.W., 4th FLOOR / WASHINGTON, D.C., 20005

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 93-972 |
| v. | ) ) | Section A |
| MMAR GROUP, INC., et al., | ) ) | Chief Judge John V. Parker |
| Defendants. | ) ) | Magistrate Judge Christine A. Noland |

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE THAT, pursuant to Rule 30 of the Federal Rules of Civil Procedure, plaintiff Louisiana State Employees' Retirement System will take the deposition upon oral examination of defendant MMAR Group, Inc. at 9:30 a.m. on January 20, 1995 at the offices of its counsel, MORRIS & CAMPBELL, 600 Jefferson, Suite 1617, Houston, Texas 77002. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deponent will be required to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, with respect to the matters described on the attached Schedule A. The deposition will take place before a notary public or other officer authorized to administer an oath and will be recorded stenographically. It will continue from day to day until completed. You are invited to attend and cross examine.

DEPOSITION
EXHIBIT
/
1/20/95

Respectfully submitted,

Michael H. Rubin, Bar Roll Number 10833
S. Jess Sperry, Bar Roll Number 19161
MCGLINCHEY STAFFORD LANG
A LAW CORPORATION
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
(504) 383-9000

and


_Albert W. Turnbull_

Joseph M. Hassett, Trial Attorney
George H. Mernick, III
Albert W. Turnbull
Christopher P. Gilkerson
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
(202) 637-5600

COUNSEL FOR PLAINTIFF LOUISIANA STATE
EMPLOYEES' RETIREMENT SYSTEM

# SCHEDULE A

TO:   MMAR GROUP, INC.
c/o Mark C. Harwell, Esq.
MORRIS & CAMPBELL
600 Jefferson, Suite 1617
Houston, Texas 77002

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, you are hereby required to designate one or more officers, directors, or managing agents, or other persons who consent to testify on your behalf, to give testimony as to the following matters:

1.     The system by which MMAR tape-recorded conversations between or among its personnel and others, including Vernon Strickland, the organization of conversations on the recording system, and the means of identifying and locating particular conversations recorded by the system.

2.     The location and content of any tapes in MMAR's possession, custody or control that contain conversations which refer or relate to LASERS, any securities owned by LASERS, any offers to sell securities to or buy securities from LASERS, or the prices of any securities in LASERS' portfolio.

3.     The location and content of any tapes in MMAR's possession, custody or control that contain conversations which involve Vernon Strickland or which refer or relate to Vernon Strickland.

4.     The location and content of any transcripts or other documents reflecting the contents of tapes referred to by Nos. 2 or 3, above.

5.     The source of the transcripts bates-numbered MMAR000001-1056, including the identity of the transcriber(s) and the date(s) when the transcripts were made.

6.     The process by which the conversations reflected in MMAR000001-1056 were selected for transcription.

SCHEDULE A
PAGE 1
\\\DC\63064\0001\PL004101.DOC

# CERTIFICATE

I certify that copies of the foregoing Notice of Deposition and the attached Schedule A have been mailed today, first class postage prepaid, to counsel of record for the defendants as follows:

Mark C. Harwell, Esq.  
MORRIS & CAMPBELL  
600 Jefferson, Suite 1617  
Houston, Texas 77002

Eric J. Mayer, Esq.  
SUSMAN GODFREY, L.L.P.  
5100 First Interstate Bank Plaza  
1000 Louisiana  
Houston, Texas 77002-5096

Carl D. Rosenblum, Esq.  
JONES WALKER WAECHTER, POITEVENT,  
  CARRÈRE & DENÈGRE  
Place St. Charles  
201 St. Charles Avenue  
New Orleans, Louisiana 70170-5100

John Dale Powers, Esq.  
POWERS, CLEGG & WILLARD  
7967 Office Park Boulevard  
P.O. Box 15948  
Baton Rouge, Louisiana 70895

I further certify that copies of the foregoing were faxed on this day to Messrs. Harwell and Mayer.

Washington, D.C. on this 4th day of January, 1995

_____
Albert W. Turnbull

\\\DC\63064\0001\PL004101.DOC

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM, | § § § | |
| Plaintiff, | § § | Civil Action No. 93-972 |
| v. | § § | Chief Judge John V. Parker |
| MMAR GROUP, INC., MONEY MANAGEMENT & ANALYTICAL RESEARCH, INC., CORY J. MINER, PAUL IRA BROWN, and RICHARD EVANS, | § § § § § § | Magistrate Judge Christine A. Noland |
| Defendants. | § | |

DEFENDANTS' RESPONSE TO PLAINTIFF'S THIRD
REQUEST FOR PRODUCTION OF DOCUMENTS

TO:  Louisiana State Employees' Retirement System, by and through
its attorneys of record:

| | |
|---|---|
| Joseph M. Hassett, Esq. | Michael H. Rubin, Esq. |
| George H. Mernick, III, Esq. | S. Jess Sperry, Esq. |
| Hogan & Hartson | McGlinchey, Stafford & Lang |
| 555 Thirteenth Street, M.W. | One American Place, 9th Floor |
| Washington, D.C. 20004-1109 | Baton Rouge, LA  70825 |

Defendants MMAR Group, Inc., Money Management & Analytical

Research, Inc., Cory J. Miner, Paul Ira Brown, and Richard Evans

("Defendants") respond to the Plaintiff's Third Request for Produc-

tion of Documents in the above-captioned proceeding as follows:

REQUEST:

"To the extent not already produced in response to Plaintiff's
First Request for Production, transcripts of all taped
conversations between LASERS and MMAR personnel on the trade dates
indicated on the attached two lists.  The first list (partial
analysis of mark-ups) identifies LASERS' purchases of securities
through MMAR.  The second list (partial analysis of mark-downs)
identifies LASERS' sales through that firm."

RESPONSE:

Defendants respectfully object to the Third Request for

Production of Documents (the "request").  The request requires the

DEPOSITION
EXHIBIT
2

review of a voluminous number of audio records  covering full-day recordings of more than 275 actual days, and the transcription of countless excerpts of conversations therefrom.  These requirements are overly burdensome, and impose an undue hardship and expense upon Defendants.  Moreover, the request is so broad that it is not reasonably calculated to lead to the discovery of admissible evidence in this case.  Accordingly, no documents will be produced in response to the request.  This response and objection is supported by the Affidavit of William R. Fincher, attached hereto and incorporated by reference herein.

Respectfully submitted,

John Dale Powers
LSBA No. 8805
7967 Office Park Boulevard
Post Office Box 15948
Baton Rouge, LA   70895
(504) 928-1951

OF COUNSEL:

POWERS, CLEGG & WILLARD
7967 Office Park Boulevard
Post Office Box 15948
Baton Rouge, LA   70895
(504) 928-1951

Kenneth M. Morris
Mark C. Harwell
John R. Knight
600 Jefferson, Suite 1617
Houston, Texas   77002
(713) 659-8697

OF COUNSEL:

MORRIS & CAMPBELL
600 Jefferson, Suite 1617
Houston, Texas   77002
(713) 659-8697

Attorneys for Defendants
MMAR GROUP, Inc., Money
Management & Analytical
Research, Inc., Cory J. Miner,
and Paul Ira Brown

- 2 -

## CERTIFICATE OF SERVI

I hereby certify that a true and correct copy of the foregoing Defendants' Response to Plaintiff's Third Request for Production of Documents has been forwarded to the parties listed below, by United States Mail, certified, return receipt requested, on this _____ day of September, 1994:

Michael H. Rubin, Esq.
S. Jess Sperry, Esq.
McGlinchey, Stafford & Lang
One American Place
Baton Rouge, LA  70825

Joseph M. Hassett, Esq.
George H. Mernick, III, Esq.
Hogan & Hartson
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109

Eric J. Mayer, Esq.
Susman Godfrey, L.L.P.
5100 First Interstate Bank Plaza
1000 Louisiana
Houston, TX  77002-5096

Carl D. Rosenblum, Esq.
Jones, Walker, Waechter,
  Poitevent, Carrère & Denègre
Place St. Charles
201 St. Charles Avenue
New Orleans, LA  70170-5100

_____
John R. Knight

- 3 -

IN HE UNITED STATES DISTRICT JRT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOUISIANA STATE EMPLOYEES'<br>RETIREMENT SYSTEM,<br><br>     Plaintiff,<br><br>v.<br><br>MMAR GROUP, INC., MONEY<br>MANAGEMENT & ANALYTICAL<br>RESEARCH, INC., CORY J. MINER,<br>PAUL IRA BROWN, and RICHARD<br>EVANS,<br><br>     Defendants. | S<br>S<br>S<br>S<br>S<br>S<br>S<br>S<br>S<br>S<br>S<br>S<br>S<br>S | Civil Action No. 93-972<br><br>Chief Judge John V. Parker<br><br>Magistrate Judge<br>Christine A. Noland |

## AFFIDAVIT OF WILLIAM R. FINCHER

THE STATE OF TEXAS     S
                             S
COUNTY OF DALLAS     S

Before me, the undersigned authority, on this day personally appeared William R. Fincher, who being by me duly sworn, under oath did say that the facts and statements made herein are true and correct and depose as follows.

1. "My name is William R. Fincher. I am over 21 years of age, of sound mind, and competent in all respects to make this Affidavit. I make this Affidavit in support of Defendants' Response to Plaintiff's Third Request for Production of Documents in the above-captioned proceeding.

2. "Until Money Management and Analytical Research ceased operations, I was an employee of the MMAR Group ("MMAR"). Since that time, I have continued to perform work assignments for Mr. Cory Miner, a former officer of MMAR, as requested. At MMAR, one of my responsibilities was, and has thereafter continued to be,

working with the eritrac 9000 Series Dictap ne recording system formerly used by the company. Accordingly, I am familiar with the manner in which that system worked, and the effort that would now be required to isolate specific recordings therein.

3. "MMAR's offices in Houston, Texas had approximately 110 telephones. Conversations on most of those telephones were recorded using the Veritrac 9000 Series system, one of Dictaphone's top of the line systems. The primary recording system consists of two large reel to reel tape decks. Each reel is one inch wide and 31 inches in diameter. A single reel has the capacity to record approximately two work days, depending on the exact length of the tape. On work days, the system began recording automatically at 0700 hours, and stopped recording automatically at 1900 hours. Sixty channels were simultaneously recorded on a single tape.

4. "The recording system's features include, among other things, a monitor, Auto Search, and Audio Search. The monitor visually displays the day, month and year of a recording, as well as a numerical designation of 1 through 60, for each telephone being recorded. When a conversation occurs on a specific telephone extension, the corresponding number for that channel will become brighter or bolder, unless the party speaking is whispering or is some distance from the telephone.

5. "The Auto Search feature can automatically locate a specific conversation if (but only if) the exact channel, day and time are known. The Audio Search feature is intended to be a high-speed listener, i.e., it locates the next relevant conversation by sound. Unfortunately, due to a combination of limitations in

- 2 -

technology coupl.. with an individual's offic. acoustics and work habits, Audio Search is not "foolproof." When the Audio Search is engaged, it may stop for no apparent reason; at other times, it may miss certain conversations. The conversations most often missed are the ones taking place while the telephone handset is in the cradle. Further, although not by design, MMAR's telephones also picked up non-telephone conversations in the immediate vicinity, adding to the volume of recorded material. Finally, conversations might also be located on the channel for the lunchroom, conference rooms, and the P.A. system. As a result, a person receiving a call might pick it up at the nearest available extension.

6. "Based upon my knowledge of, and experience with, MMAR's telephone recording system, I am able to state that, for one individual to simply monitor (without transcribing) a single tape as described above, without chancing a missed conversation, would require about nine months time. In other words, to monitor approximately 2 days of taped conversations (i.e., a single tape) would take one person working full time approximately 9 months. That effort would only locate such conversations as were sought, i.e., it would not produce copying or transcription of any conversations. Additional effort would be required for such endeavors.

7. "In connection with the preparation of this Affidavit, I have reviewed the Plaintiff's Third Request for Production of Documents in this case. As I understood the request set forth therein, the plaintiff seeks transcripts of all taped telephone conversations between LASERS and MMAR personnel on certain "trade dates" indicated on two attachments. By my count, there are at

- 3 -

least 275 separate "trade dates" indicated on the attachments to the Request for Production of Documents.

8.   "As noted above, approximately 9 months would be required for one person to monitor approximately two days of recordings in MMAR's recording system.  At that rate, simply monitoring all of the taped conversations on the 275 plus "trade dates" referenced in the Request would take more than 50 man-years of work.  Identifying and transcribing "all taped conversations between LASERS and MMAR personnel" would then take substantial additional time of unknown duration, depending upon the number of calls retrieved and the features of those calls.

"And further affiant sayeth not."

             :

_____
WILLIAM R. FINCHER

    Subscribed and sworn to before me this 28ᵗʰ day of September, 1994.


_____
Notary Public in and for the State of Texas

Printed Name of Notary:

_____



DENISE DELTO
Notary Public
STATE OF TEXAS
My Comm. Exp. FEB 18, 1998

- 4 -

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

LOUISIANA STATE EMPLOYEES'  )
RETIREMENT SYSTEM,          )
                            )       Civil Action No. 93-972
          Plaintiff,        )
                            )       Section A
     v.                     )
                            )       Chief Judge John V. Parker
MMAR GROUP, INC., et al.,   )
                            )       Magistrate Judge Christine A. Noland
          Defendants.       )

### NOTICE OF DEPOSITION

PLEASE TAKE NOTICE THAT, pursuant to Rule 30 of the Federal Rules of Civil Procedure, plaintiff Louisiana State Employees' Retirement System will take the deposition upon oral examination of defendant MMAR Group, Inc. at 9:30 a.m. on January 20, 1995 at the offices of its counsel, MORRIS & CAMPBELL, 600 Jefferson, Suite 1617, Houston, Texas 77002. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deponent will be required to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, with respect to the matters described on the attached Schedule A. The deposition will take place before a notary public or other officer authorized to administer an oath and will be recorded stenographically. It will continue from day to day until completed. You are invited to attend and cross examine.

NOTICE OF DEPOSITION
PAGE 1
\\\DC\63064\0001\PL004101.DOC

Respectfully submitted,

Michael H. Rubin, Bar Roll Number 10833
S. Jess Sperry, Bar Roll Number 19161
MCGLINCHEY STAFFORD LANG
A LAW CORPORATION
Ninth Floor, One American Place
Baton Rouge, Louisiana  70825
(504) 383-9000

and


_Albert W. Turnbull_
Joseph M. Hassett, Trial Attorney
George H. Mernick, III
Albert W. Turnbull
Christopher P. Gilkerson
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
(202) 637-5600

COUNSEL FOR PLAINTIFF LOUISIANA STATE
EMPLOYEES' RETIREMENT SYSTEM

# SCHEDULE A

TO:   MMAR GROUP, INC.
       c/o Mark C. Harwell, Esq.
       MORRIS & CAMPBELL
       600 Jefferson, Suite 1617
       Houston, Texas 77002

        Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, you are hereby required to designate one or more officers, directors, or managing agents, or other persons who consent to testify on your behalf, to give testimony as to the following matters:

        1.    The system by which MMAR tape-recorded conversations between or among its personnel and others, including Vernon Strickland, the organization of conversations on the recording system, and the means of identifying and locating particular conversations recorded by the system.

        2.    The location and content of any tapes in MMAR's possession, custody or control that contain conversations which refer or relate to LASERS, any securities owned by LASERS, any offers to sell securities to or buy securities from LASERS, or the prices of any securities in LASERS' portfolio.

        3.    The location and content of any tapes in MMAR's possession, custody or control that contain conversations which involve Vernon Strickland or which refer or relate to Vernon Strickland.

        4.    The location and content of any transcripts or other documents reflecting the contents of tapes referred to by Nos. 2 or 3, above.

        5.    The source of the transcripts bates-numbered MMAR000001-1056, including the identity of the transcriber(s) and the date(s) when the transcripts were made.

        6.    The process by which the conversations reflected in MMAR000001-1056 were selected for transcription.

SCHEDULE A
PAGE 1
\\\DC\63064\0001\PL004101.DOC

# CERTIFICATE

I certify that copies of the foregoing Notice of Deposition and the attached Schedule A have been mailed today, first class postage prepaid, to counsel of record for the defendants as follows:

Mark C. Harwell, Esq.
MORRIS & CAMPBELL
600 Jefferson, Suite 1617
Houston, Texas 77002

Eric J. Mayer, Esq.
SUSMAN GODFREY, L.L.P.
5100 First Interstate Bank Plaza
1000 Louisiana
Houston, Texas 77002-5096

Carl D. Rosenblum, Esq.
JONES WALKER WAECHTER, POITEVENT,
   CARRÈRE & DENÈGRE
Place St. Charles
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100

John Dale Powers, Esq.
POWERS, CLEGG & WILLARD
7967 Office Park Boulevard
P.O. Box 15948
Baton Rouge, Louisiana 70895

I further certify that copies of the foregoing were faxed on this day to Messrs. Harwell and Mayer.

Washington, D.C. on this 4th day of January, 1995

_____
Albert W. Turnbull

\\\DC\63064\0001\PL004101.DOC

CVILPDF – www.fasisc.com

# GEORGE, DONALDSON & FORD

## FILE COPY

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELORS AT LAW

1000 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
(512) 495-1400

James A. Hemphill
Writer's Direct Number:
(512) 495-1430

E-Mail: hemphill@gdf.com
Fax: (512) 499-0094

January 3, 1996

Mr. Mark C. Harwell                                    *via* Telecopy (713) 659-3020
Morris & Campbell, P.C.
600 Jefferson, Suite 1617
Houston, Texas 77002

Re:     C.A. No. 95-1262; *MMAR Group, Inc.*
        *v. Dow Jones & Co., Inc. and Laura Jereski*;
        U.S.D.C., S.D. Texas, Houston Division

Dear Mr. Harwell:

Our continuing review of MMAR trading data that you have provided to us on computer disk has raised a few technical questions.

1.     When the file MMARACCT.WK4 is opened using Lotus Release 4.0, the message "Not a valid worksheet file" is displayed. A disk-checking program was run against the disk, which turned up negative. Do you have any information regarding this, and/or could you provide us with a working copy of this file?

2.     When the file DEALER.WK4 is opened using Lotus Release 4.0, the message "File and/or extension converted" is displayed. Again, a disk-checking program revealed no problems.

3.     Clients in the files MMARACCT.WK4 and DEALER.WK4 are listed alphabetically, but no clients after Norwest Bank Denver are listed. Are there clients missing from these files?

4.     The datasets provided to us indicate the client to whom a security was sold. Do you have records indicating the firm or organization from which each security was purchased?

5.     The datasets did not include CUSIP numbers for the securities. Can you provide this information?



GEORGE, DONALDSON & FORD
A REGISTERED LIMITED LIABILITY PARTNERSHIP

Mr. Mark C. Harwell
January 3, 1996
Page 2

6.    The following may be a problem with the data itself, or may instead be a function of how these trades were recorded: Some trades show that the MMAR cost was *higher* than the sales price, but a commission was still received by MMAR.  An example is the next-to-last trade on 92TRADE.WK1.  Is the data somehow corrupted, or is the disks' account of the trades correct?

Additionally, we have not received a response from our letter of December 27, 1995, which included inquiries regarding your response to our requests for production.  Please let us know the status of these matters at your earliest convenience.

Thank you for your continued cooperation.

Sincerely yours,

GEORGE, DONALDSON & FORD, L.L.P.

By _____
   James A. Hemphill

JAH/jw

MITCHELL E. AYER
JOHN S. BRANNON
RHETT G. CAMPBELL
PATRICIA H. CHICOINE
W. MARK COTHAM
KIRK W. EVANS
DAVID A. FURLOW
MARK C. HARWELL
KENNETH M. MORRIS

# MORRIS & CAMPBELL

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
600 JEFFERSON, SUITE 1617
HOUSTON, TEXAS 77002



(713) 659-8597
TELEX: 794608 TCIH
FAX: (713) 659-3020

January 5, 1996

**VIA TELECOPIER NO. (512) 499-0094**

Mr. James A. Hemphill
George, Donaldson & Ford
114 West 7th Street, Suite 1000
Austin, Texas 78701

> Re: C.A. No. 95-1262; *MMAR Group, Inc. v. Dow Jones & Co., Inc. and Laura Jereski*, in the United States District Court for the Southern District of Texas, Houston Division.

Dear Mr. Hemphill:

This letter is to respond to your letter dated January 3, 1996. I am trying to help you understand the materials. My comments herein are strictly my own. Do not interpret any of my comments as admissions or authorized representations on behalf of MMAR.

1., 2., and 3. All the .wk4 extensions are files that require LOTUS 1-2-3 Release No. 5. They don't work on Release No. 4.0. You now have a good excuse to upgrade.

4. The files are the same. If the status shows "buy", that means MMAR sold it to its customer. If the status shows "sell", that means MMAR bought it from the customer.

5. The CUSIP numbers appear on the confirmation statements and trade recaps.

6. If you look, I think you will find that the status of such trades is "sell". When MMAR's price is greater than the customer's price, that is a markdown.



RECEIVED

JAN - 8

**Mr. James A. Hemphill**
**January 5, 1996**
**Page -2-**

      Relating to you prior letter, we have a large volume of documents ready and waiting. The documents have been here since we filed our response to your request for production. I doubt very seriously that you would want most of them, even though they fall within the scope of your document request. I recommend that you make plans to look at the documents before you decide to copy them. Perhaps you or David Donaldson can do that in conjunction with Robert Watson's deposition here at our offices on January 8, 1996.

Very truly yours,

Mark C. Harwell

**MCH/der**

Case 4:95-cv-01262  Document 59  Filed on 01/31/96 in TXSD  Page 107 of 112

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELORS AT LAW

# FILE COPY

James A. Hemphill
Writer's Direct Number:
(512) 495-1430

1000 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
(512) 495-1400

E-Mail: hemphill@gdf.com
Fax: (512) 499-0094

January 5, 1996

Mr. Mark C. Harwell
Morris & Campbell, P.C.
600 Jefferson, Suite 1617
Houston, Texas  77002

*via* Telecopy (713) 659-3020

Re:  C.A. No. 95-1262; *MMAR Group, Inc.*
*v. Dow Jones & Co., Inc. and Laura Jereski*;
U.S.D.C., S.D. Texas, Houston Division

Dear Mr. Harwell:

Thank you for your fax of today responding to my recent correspondence.

Regarding document review: we will plan on having at least two people at your office on Monday, January 8, one for the deposition and one to review documents.  If necessary, we would like to complete our document inspection on the following day.

Regarding the technical problems with the disks: Lotus 1-2-3 Release 5 did not help; the same technical problems exist.  To recap, those are:

1.    When the file MMARACCT.WK4 is opened, the message "Not a valid worksheet file" is displayed.  A disk-checking program was run against the disk, which turned up negative.  Do you have any information regarding this, and/or could you provide us with a working copy of this file?

2.    When the file DEALER.WK4 is opened, the message "File and/or extension converted" is displayed.  Again, a disk-checking program revealed no problems.

3.    Clients in the files MMARACCT.WK4 and DEALER.WK4 are listed alphabetically, but no clients after Norwest Bank Denver are listed.  Are there clients missing from these files, or are the listings correct?

If these technical problems are not encountered on your copies of these disks, we would appreciate receiving new copies.

GEORGE, DONALDSON & FORD
A REGISTERED LIMITED LIABILITY PARTNERSHIP

Mr. Mark C. Harwell
January 5, 1996
Page 2

Again, thank you for your continued cooperation.

Sincerely yours,

GEORGE, DONALDSON & FORD, L.L.P.

By

James A. Hemphill

JAH/jw

CVIsPDF – www.fastio.com

## GEORGE, DONALDSON & FORD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELORS AT LAW

1000 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
(512) 495-1400

**David H. Donaldson, Jr.**
Writer's Direct Number:
(512) 495-1414

Post Office Box 684667
Austin, Texas 78768-4667
Fax: (512) 499-0094

*FILE COPY*

January 29, 1996

Mr. Kenneth M. Morris
Morris & Campbell, P.C.
600 Jefferson, Suite 1617
Houston, Texas 77002

*via* Telecopy (713) 659-3020

Re:  C.A. No. 95-1262; *MMAR Group, Inc.*
*v. Dow Jones & Co., Inc. and Laura Jereski*;
U.S.D.C., S.D. Texas, Houston Division

Dear Ken:

We continue to work on lining up further discovery, but it is obvious to us that we will need additional time to complete discovery.  We are working on scheduling the following depositions:

- NASD representative (now set for February 14) -- New Orleans
- Andy Favret (now set for February 14) -- New Orleans
- Bank of New York representative -- New York
- Banco Portuguesa representative -- New York
- Mike Shingleton (now set for February 9) -- Portsmouth, NH
- Callan & Associates representative -- San Francisco area
- Bill Fincher -- Houston
- Art Leider -- San Diego area
- Frank Ramirez
- Worth Buntjen -- Piper Jaffray offices
- MMAR Group representative

We anticipate additional depositions will be needed, but the group we have outlined above is well within the fifteen non-party, non-expert depositions allowed by the Court.

We have not gotten calls back from Bill Fincher to arrange to  obtain copies of cassette tapes that have already been obtained for representatives of LASERS and the defendants in the Proskauer, Rose lawsuits as well as listen to other tapes that have not been transcribed.  As you might expect, we need to be sure we have adequately examined the tapes, and we can authenticate them.  We cannot complete that process until we are given access to the tapes.



**GEORGE, DONALDSON & FORD**
A REGISTERED LIMITED LIABILITY PARTNERSHIP

Mr. Kenneth M. Morris
January 29, 1996
Page 2

Rather than trying to rush to schedule these depositions between now and February 15, we would propose that we agree to an extension of the deadlines for discovery, dispositive motions, and other motions for about sixty (60) days, closing discovery on Monday, April 15, file dispositive motions Monday, April 22, and all other motions by Monday, April 29. We would not change the date for the pretrial order (June 1, 1996) or the docket call (July 5, 1996). We can then try to complete the review of the tapes and schedule the depositions in a fashion that will be more flexible for our schedules and those of the witnesses.

If we cannot agree to such an extension, then we will need to seek the assistance of the Court in extending the deadlines for the scheduling order. Please let us know your position.

As I mentioned in my telephone conversation with Mark Harwell, Frank Ramirez is available on Friday, February 2, for deposition in Dallas. We want to schedule his deposition for 9:00 a.m. at First Southwest Company, 1700 Pacific, Suite 500. We currently have Paul Brown scheduled for Friday, February 2. We would like to move his deposition to Monday, February 5, at 9:30 a.m. in our offices.

Sincerely yours,

GEORGE, DONALDSON & FORD, L.L.P.

By _____
David H. Donaldson, Jr.

DHDjr/db

GEORGE, DONALDSON & F   .D
A REGISTERED LIMITED LIABILITY PARTNERSHIP

Mr. Kenneth M. Morris
January 29, 1996
Page 3

cc:     Jim George [firm]
        Jim Hemphill [firm]
        Renea Hicks [firm
        Laura Stevenson [firm]
        Stuart Karle

CMPDF - www.fasio.com