CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
F I L E D
*May 23, 1997*
MICHAEL N. MILBY, CLERK
BY DEPUTY *N. Tippen*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

MAY 2 7 1997

Michael N. Milby, Clerk

MMAR GROUP, INC., §
§
        Plaintiff, §
§
v. § CIVIL ACTION NO. H-95-1262
§
DOW JONES & COMPANY, INC. and §
LAURA JERESKI, §
§
        Defendants. §

## MEMORANDUM AND ORDER

Pending are Defendants' Post-Verdict Motion for Judgment as a Matter of Law (Document No. 177) and Plaintiff's Motion for Entry of Judgment (Document No. 178). After careful consideration of the motions, briefs, oral arguments, and governing authorities, the Court concludes as follows:

### The Standard for Judgment as a Matter of Law

In Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc), the Court set forth the standard for deciding a motion for directed verdict and motion for judgment notwithstanding the verdict; this standard now applies to Rule 50 motions for judgment as a matter of law:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence -- not just that evidence which supports the non-mover's case -- but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.

198

On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374-75 (footnote omitted). This decision, cited and followed by the courts of this circuit in many hundreds of cases since 1969, provides the framework for the analysis that follows. See Mattern v. Eastman Kodak Co., 104 F.3d 702, 705 (5th Cir. 1997) ("It goes without saying that the standard of review for Rule 50 motions for judgment is found in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc).") "The aim is to determine whether a rational jury could reach the conclusion that this jury actually reached." Fields v. J.C. Penney Co., Inc., 968 F.2d 533, 536 (5th Cir. 1992).

The standard to be applied in deciding a Rule 50 motion is the same in the trial court and in the court of appeals. Hiltgen v. Sumrall, 47 F.3d 695, 699-700 (5th Cir. 1995); London v. MAC Corp. of America, 44 F.3d 316, 318 (5th Cir.) cert. denied, 116 S. Ct. 99 (1995), citing Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 950 (5th Cir. 1994), cert. denied, 115 S. Ct. 1110 (1995).

2

It has long been held that the directed verdict practice does not offend the Seventh Amendment. <u>Galloway v. United States</u>, 63 S. Ct. 1077 (1943); <u>Boeing Co. v. Shipman</u>, 411 F.2d at 374, n.13. Nonetheless, the Fifth Circuit upon a number of occasions has reminded us of the stricture of the Seventh Amendment. For example, in <u>Gross v. Black & Decker (U.S.), Inc.</u>, 695 F.2d 858, 865 (5th Cir. 1983), the Court wrote:

> This Court affords great deference to jury findings. The Seventh Amendment to the Constitution provides that no fact tried by a jury shall be re-examined by any court of the United States except according to the rules of common law. For that reason, an appellate court may not reweigh the evidence or set aside the jury's verdict merely because the appellate judges could have drawn different inferences or conclusions from the evidence, or feel that other results might be more reasonable.

*See also* <u>Gaspard v. Taylor Diving & Salvage Co., Inc.</u>, 649 F.2d 372, 374 (5th Cir. 1981), *cert. denied*, 102 S. Ct. 1252 (1982) ("We are mindful that, in light of the seventh amendment guarantee of the right to jury trial, we must proceed cautiously, and we must validate the jury verdict if at all possible."); <u>Narcisse v. Illinois Cent. Gulf R. Co.</u>, 620 F.2d 544, 546 (5th Cir. 1980) ("We must consider whether the trial court accorded the deference to the [] jury's verdict which is required by the seventh amendment to the Constitution").

## The Verdict on Liability

Defendants first argue that judgment should be granted to Defendants because the evidence did not support the verdict on liability.  The jury found from a preponderance of the evidence that five of the challenged statements contained in the Article were false and defamatory, and that Dow Jones and Laura Jereski were each negligent in publishing those statements.  Because Plaintiff was neither a general purpose nor a limited purpose public figure, it was required to prove only that Defendants were negligent in making the libelous statements.  Gertz v. Robert Welch, Inc., 94 S. Ct. 2997, 3012 (1974); Einhorn v. LaChance, 823 S.W.2d 405, 413 (Tex. App. -- Houston [1st Dist.] 1992, writ dism'd w.o.j.), *cert. denied*, 116 S. Ct. 1420 (1996).

On each of the five statements that the jury found were false and defamatory and that Defendants were negligent in publishing, the Court finds that there was substantial evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions with respect to the libel and the negligence of Defendants.

## The Verdict on Compensatory Damages

Defendants argue that Plaintiff failed to prove that the five statements the jury found to be false and defamatory caused any injury to Plaintiff, and therefore that there is no legally sufficient evidence to support compensatory damages.  Defendants

4

argue that if the five statements found to be false and defamatory had been removed from the Article, it is highly likely that Plaintiff still would have gone out of business; and that there is no direct evidence that the five statements did in fact put it out of business. Defendants also point to the absence of a single witness who had a business relationship with MMAR who testified that any of the false and defamatory statements found by the jury had any negative impact on its dealings or willingness to deal with MMAR. Defendants also made these arguments to the jury.

There is a "strong and legitimate state interest in compensating private individuals" for the injury sustained, but this state interest "extends no further than compensation for actual injury." Gertz, 94 S. Ct. at 3011. Although Plaintiff is entitled to recover no damages for the constitutionally protected portion of the publication, it is entitled to recover damages for those "losses proximately caused by unlawful conduct." N.A.A.C.P. v. Claiborne Hardware Co., 102 S. Ct. 3409, 3428 (1982).

There was substantial evidence that MMAR sustained a precipitous decline in its theretofore substantial revenues immediately following publication of the false and defamatory statements. Other proof, including the testimony of persons knowledgeable about the securities industry, provided evidence of Plaintiff's injuries and resulting damages. Damages are often difficult to prove, and unliquidated damages proximately caused by an event are rarely ever capable of being proved with exactitude,

5

CMPDF - www.fastio.com

much less with the kind of precision for which Defendants now argue.

The jury was instructed emphatically to award no damages, if any, that Plaintiff may have sustained by reason of any statements in the Article, even though they may have been defamatory, if those statements were true or substantially true. The charge read:

> Plaintiff is not entitled to recover damages, if any, for any of the other statements in the Article -- even though they may have been defamatory -- if those statements were true or substantially true. In other words it is *only* for injuries, if any, proximately caused by Defendants' **false and defamatory** statements, if you have found such in your answer to Interrogatory No. 1, that Plaintiff MMAR obtain a recovery of damages.

Court's Instructions to the Jury, p. 21 (emphases in text of Instructions to the Jury). Neither Plaintiff nor Defendants objected to these instructions.

As observed above, the arguments made now by Defendants are essentially the same arguments that they made to the jury in arguing that the allegedly libelous statements were not a proximate cause of Plaintiff's damages. Plaintiff argued its opposing evidence to the contrary. The jury returned a verdict substantially higher than the sum to which Defendants' damages expert had testified, but substantially discounted from the award sought by Plaintiff. The Court must determine only if there is substantial evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might find that Plaintiff suffered quantifiable damages as a proximate cause

6

of the published statements found by the jury to be both false and
defamatory.  There was such evidence.

### The Verdict on Punitive Damages
### Against Dow Jones

The First Amendment requires an elevated standard of proof for
the recovery of punitive damages in a libel case brought by a
private party against a newspaper.

> [A] private defamation plaintiff must prove, by clear and
> convincing evidence, that the defendant acted with
> "actual malice" in publishing the defamatory statement to
> justify punitive damages.

Brown v. Petrolite Corp., 965 F.2d 38, 46 (5th Cir. 1992), *citing*
Gertz, 94 S. Ct. at 3012.  The term "actual malice," as applied to
this analysis, is a term of art developed in New York Times Co. v.
Sullivan, 84 S. Ct. 710, 726 (1964) and its progeny.  A defamatory
statement is made with actual malice if made with knowledge that it
is false or with a reckless disregard of whether it is false or
not.  Reckless disregard means a "high degree of awareness of . .
. probable falsity," although the term "cannot be fully encompassed
in one infallible definition."  St. Amant v. Thompson, 88 S. Ct.
1323, 1325 (1968); Brown, 965 F.2d at 46.

In Brown the Fifth Circuit described the heightened review
required in a case such as this:

> [W]e do not defer to the jury but, instead, must conduct
> an independent review of the record to determine whether

7

> it presents clear and convincing evidence of [the
> defendant's] actual malice. . . . We limit this
> heightened review, however, to the ultimate factual
> finding of the constitutionally mandated actual malice
> element. Our inquiry does not require us to conduct a *de
> novo* review of the jury's determinations on preliminary
> factual issues or questions of credibility.

Id. at 46 (citations omitted).

The parties agree that the foregoing principles apply to this case. The parties also agree that Texas law imposes upon MMAR, in order to recover punitive damages from Dow Jones, the burden of proving the following:

1.  Dow Jones or a managerial agent of Dow Jones authorized the doing and the manner of the act, or

2.  Ms. Jereski was unfit and Dow Jones or a managerial agent was reckless in employing or retaining her, or

3.  Some agent was employed by Dow Jones in a managerial capacity and was acting in the scope of employment, or

4.  Dow Jones or a managerial agent of Dow Jones ratified or approved the act.

*See* Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, 404-06 (1934).

Dow Jones contends that MMAR did not meet its burden under Fort Worth Elevators and further, that Plaintiff failed to establish with "convincing clarity" that Dow Jones published false, defamatory statements with actual malice -- that is, with knowledge that they were false or with a "high degree of awareness of [] their probable falsity," as required by Gertz and its progeny.

Dow Jones argues that no punitive damages may be adjudged against Dow Jones because the people acting for Dow Jones were not

8

managers or managing agents as required by <u>Fort Worth Elevators</u>. Indeed, Texas has been recognized as being among that "substantial minority of courts" which declare that an employer may not be held vicariously liable for punitive damages "unless it either authorizes, participates in, or ratifies the employee conduct giving rise to such damages." <u>Embrey v. Holly</u>, 442 A.2d 966, 969-70 (Md. 1982), *citing* at n.8 <u>Gulf, C.&S.F. Ry. Co. v. Reed</u>, 80 Tex. 362, 15 S.W. 1105 (1891). Thus, as Dow Jones argues, Texas law precludes the imposition of punitive damages upon the publisher of a libelous statement without independent proof that the publisher, here the corporation, authorized or ratified the publication with the requisite state of mind. *See* <u>Wortham-Carter Publ'g Co. v. Littlepage</u>, 223 S.W. 1043, 1046 (Tex. Civ. App. -- Fort Worth 1920, no writ) (judgment for punitive damages against publisher of *Fort Worth Star Telegram* reversed; corporation can be held liable for exemplary damages "only in these cases where the agent who acted with express malice is alleged and shown to be something more than a mere servant, in other words, an alter ego of the corporation, or when the malicious act of the servant is alleged and shown to have been adopted or ratified by the corporation after knowledge of the malice."); *accord* <u>Associated Press v. Walker</u>, 393 S.W.2d 671 (Tex. Civ. App. -- Fort Worth 1965, writ ref'd n.r.e.), *rev'd sub nom. on other grounds*, <u>Curtis Publ'g Co. v. Butts</u>, 87 S. Ct. 1975 (1967) (affirming trial court's decision to set aside punitive damage award because plaintiff failed to meet requirements of <u>Wortham-Carter Publ'g Co. v. Littlepage</u>).

MMAR contends that Defendants waived this argument by failing to object to the Court's submission of the punitive damage interrogatory and by not moving for judgment as a matter of law on this point before it was submitted to the jury.

In reply, Defendants rely upon their Motions for Judgment as a Matter of Law made at the close of Plaintiff's evidence and at the close of all evidence in which they argued that Plaintiff failed to prove by clear and convincing evidence that Defendants acted with knowledge that the challenged statements were false, or with a high degree of awareness that the statements were probably false, and that there was no legally sufficient evidence to support a finding that the Defendants' subjective state of mind was one of awareness of falsity or probable falsity.   Citing the Fifth Circuit's tendency toward liberality when analyzing the adequacy of motions for judgment as a matter of law, Dow Jones contends that its motions were sufficient to preserve the argument that there was no evidence to support a judgment for punitive damages against Dow Jones as a principal based on the conduct of employees who were not managers or managing agents. *See* Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 610 (5th Cir.), *cert. denied*, 117 S. Ct. 182 (1996); MacArthur v. University of Texas Health Ctr at Tyler, 45 F.3d 890, 896-97 (5th Cir. 1995); Charbonnet v. Lee, 951 F.2d 638, 643 (5th Cir.), *cert. denied*, 112 S. Ct. 2994 (1992); Miller v. Rowan Cos., Inc., 815 F.2d 1021, 1024 n.4 (5th Cir. 1987), (stating that "this Circuit and others have rejected the

CHzPDF - www.fazio.com

rigid application of Rule 50(b) in favor of a more liberal approach," and citing numerous cases).

This Court finds that Defendants have not waived the point. Dow Jones cannot be held liable as a principal for punitive damages for the actual malice, if any, of Ms. Jereski, Ms. Miller, or Mr. Clements, unless Dow Jones through its managing agent(s) actually adopted or ratified any such conduct with knowledge of the actual malice.[1]

The jury found from what it regarded as clear and convincing evidence that Dow Jones published the Article with knowledge of the falsity, or with a degree of awareness of the probable falsity, or with serious doubt as to the truth of the statements that it found to be false and defamatory. Thus, the jury found that Dow Jones acted with actual malice in publishing the Article.[2] The Court must determine whether there was proof from which a reasonable jury could find from clear and convincing evidence that Dow Jones acted with actual malice.

---

[1]     In addition to the reporter Laura Jereski, Plaintiff names Gay Miller, Jonathan Clements, Byron Calame, and Stuart Karle as the only persons employed by Dow Jones who had any role in the preparation or publication of the Article. Mr. Karle was a lawyer for the *Journal*, whose only involvement appears to have been in receiving oral and written complaints from MMAR's lawyers about Ms. Jereski's investigation of MMAR before the Article was published. There is no evidence that he had an editorial function or had any authority to direct publication of the Article. Mr. Calame, the *Journal*'s deputy managing editor is the only employee who appears to have been a managing agent.

[2]     The jury made the same finding against Ms. Jereski; Defendants' motion as it relates to her is discussed below.

The evidence is that Dow Jones, among other enterprises, owns and publishes *The Wall Street Journal.* When the Article was published Defendant Jereski was a relatively new employee at the *Journal.* Ms. Jereski graduated from Harvard University in 1983. Between 1985 and 1993, she had jobs at *Forbes* magazine as a reporter and later as an associate editor, and at *Business Week*, where she was a correspondent on business and financial stories. She joined the *Journal* in March, 1993, about seven months before the Article was published. During this seven-month period she wrote more than 30 by-lined articles which were published in the *Journal*; a number of these articles reported on aspects of the bond business. A newly-hired reporter for the newspaper that has the largest readership in America, Ms. Jereski was neither a Dow Jones manager or a managing agent and she had no authority to direct or to approve the publication of anything in the *Journal*.

Plaintiff argues, however, that Ms. Jereski was an unfit journalist and that Dow Jones should have known it and was reckless in continuing to employ her on this Article; hence, Dow Jones should be held liable for punitive damages. Plaintiff relies primarily on evidence that Ms. Jereski had had no formal education in journalism and Plaintiff argues that Ms. Jereski's eight years of previous journalistic experience with business magazines did not prepare her for work at a business newspaper such as the *Journal*. There is no evidence, however, that Dow Jones had received any complaints about the accuracy and content of Ms. Jereski's numerous previously published stories. Moreover, the record contains

12

substantial evidence that neither a college journalism class nor a degree in journalism is required for one to work successfully as a journalist.  Plaintiff's argument that Dow Jones should be adjudged liable for punitive damages based on recklessness in employing or retaining Ms. Jereski as a journalist is not supported by a scintilla of evidence, much less by clear and convincing evidence sufficient to attribute to Dow Jones constitutional malice.

Ms. Jereski's supervising editor was Gay Miller, an employee of the *Journal* for twenty-one years, who had received her first editing assignment in 1981.  In 1993 she was a news editor in the Money and Investing Section of the *Journal*, and supervised several reporters.  Ms. Miller edited the early drafts of Ms. Jereski's article, raised questions, made comments, and otherwise performed editorial oversight.  Before the article was completed and published, however, Ms. Miller went on vacation and assigned Jonathan Clements, a reporter in whom she had confidence, to act as editor in her absence.  Mr. Clements had been employed by the *Journal* for nearly four years after having had previous journalistic experience.  He completed the editing of Ms. Jereski's Article.  Both Ms. Miller and Mr. Clements testified at trial.

Byron Calame, the *Journal*'s deputy managing editor when the Article was published, also testified at trial.  Although he routinely read the front page and lead stories word for word before publication, he was not involved in Ms. Jereski's development of the Article or in its editing, except possibly for having had a voice in the decision to pull from an earlier draft references to

13

unlawful use of drugs at MMAR. After the fact, and in conjunction with preparing to defend this lawsuit, it appears that Mr. Calame read the Article, reviewed the earlier drafts, and formed a belief that the Article contained no statements that, in the context of the entire story, were false or that would mislead a reader.

During oral arguments on the pending motion, the Court asked Plaintiff for the proof that any managing editor of Dow Jones either authorized or agreed knowingly to publish a false statement written by Ms. Jereski. Plaintiff responded in oral submissions, and later in a brief, that the jury could find that Gay Miller and Jonathan Clements had knowledge of the falsity, or a high degree of awareness of the probable falsity, of two of the statements that the jury found to be libelous. These were the limousine expense statement and the Raymond James role statement:

> **In one year, the firm ran up $2 million in limousine bills, according to Raphael Grinburg, a former employee who used to monitor travel expenses for the firm.**

and

> **The frenetic trading prompted Raymond James to take the unusual step of assigning a trader to track MMAR's complex deals. Raymond James became so concerned about the pace of MMAR's trades that it imposed a 4% limit on commissions. According to Mr. Robinson, MMAR's salesmen violated the limit periodically, prompting him to adjust the trades so that the limits were maintained.**

The limousine expense statement was inserted into the Article after Ms. Miller went on vacation and Mr. Clements assumed the editorial function. This insertion replaced another example of MMAR's "free wheeling atmosphere" that had been in the draft

14

CMPDF - www.fastio.com

examined by Mr. Clements, namely, a reference to the drug usage of MMAR's Mr. Brown to the effect that "Mr. Brown used to hand out marijuana from a five gallon Charles Chip can to salesmen." Not sure that there was such a thing as a five gallon Charles Chip can and concerned that unlawful drug usage was not pertinent to the story, Mr. Clements deleted this passage. Ms. Jereski subsequently interviewed Mr. Grinburg, who ran MMAR Travel, the MMAR-owned travel agency through which Plaintiff's employees booked their travel, who told her in effect that he had been "doubly amazed at [MMAR's] travel and entertainment" and described an expenditure of $2 million a year on "black cars." At trial Mr. Grinburg testified that the $2 million for black cars had been incurred by Fundamental Brokers, a MMAR affiliate, before that company was acquired by MMAR or its principals. Ms. Jereski testified that she understood the expenditure to have been incurred by MMAR when she wrote that "the firm ran up $2 million in limousine bills" in one year. She substituted the limousine expense anecdote for the drug use statement as an example of MMAR's free wheeling atmosphere. There is no evidence that Mr. Clements asked Ms. Jereski anything about this substituted statement, or about the reliability of its source. Assuming, as Plaintiff contends, that Mr. Clements was a managing agent of Dow Jones, there is no evidence that he knew of the falsity of the statement, or had a high degree of awareness of its probable falsity, or had any serious doubt as to the truth of the statement. That he failed to inquire and to verify its accuracy is not enough. Harte-Hanks Communications, Inc. v. Connaughton, 109

15

S. Ct. 2678, 2696 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); St. Amant v. Thompson, 88 S. Ct. 1323, 1326 (1968) ("Failure to investigate does not in itself establish bad faith.").

Plaintiff's other assertion that an editor acted with actual malice is directed against Ms. Miller. Plaintiff points out that an earlier draft of the Raymond James role statement did not include the adjective "unusual." Before leaving on vacation Ms. Miller inquired of Ms. Jereski whether Raymond James's assignment of a trader to track MMAR's complex deals was unusual. Ms. Jereski, who had already interviewed Mr. Robinson on this subject, inserted the word "unusual." Again, Ms. Miller's failure to ask any further questions of Ms. Jereski on that subject, and Mr. Clements's failure to ask any questions about it when he edited the piece, is far less than would be required to provide "clear and convincing evidence" that either Ms. Miller or Mr. Clements acted with actual malice. The failure to ask more questions or to investigate the basis for the reporter's inclusion of the descriptive term "unusual" does not constitute clear and convincing evidence from which a reasonable juror could find that either Ms. Miller or Mr. Clements had knowledge of the falsity, or a high degree of awareness of the probable falsity, or harbored serious doubts as to the truth of the Raymond James role statement. See Harte-Hanks Communications, Inc., 109 S. Ct. at 2696; St. Amant, 88 S. Ct. at 1326. In short, assuming that editors Miller and

16

Clements were employed in a managerial capacity at a level sufficient to charge Dow Jones with liability for their actual malice, if any, the record lacks the substantial proof from which a reasonable juror might find by "clear and convincing evidence" that Ms. Miller or Mr. Clements, and hence the *Journal* itself, acted with actual malice.

Plaintiff also argues that Dow Jones ratified Jereski's libelous statements, and thus may be found itself to have acted with actual malice. The evidentiary bases advanced for ratification are the testimony at trial of Dow Jones's employees, especially Byron Calame, who was the *Journal*'s deputy managing editor, and the absence of published retractions of the Article by the *Journal*.

As observed above, Mr. Calame had little if anything to do with the Article before its publication. At trial Mr. Calame defended the Article based upon his having read it and having reviewed at least some of the earlier drafts. Mr. Calame concluded from this limited survey that he thought "the essence and the thrust of this piece are right on," and that there "are no statements there that mislead the reader." Plaintiff argues that the foregoing testimony, given by Mr. Calame at the time of trial when he had "the fullest possible knowledge of Jereski's conduct," is sufficient from which to find that the *Journal* ratified Ms. Jereski's libelous statements. This evidence, however, is not clear and convincing. Mr. Calame was not shown to have made any investigation of the underlying facts, much less of all of the

17

evidentiary details.  Moreover, Mr. Calame was not present during trial as a corporate representative and, with the rule having been invoked, he was excluded from the courtroom and required not to discuss his own or the testimony of others until after he had testified and had been excused from the rule.  He did not "ratify" at trial the publication of any statement which the evidence showed that he knew or had reason to believe was false and defamatory.  To the contrary, Mr. Calame emphasized the importance of accuracy, reliable information, and precision in reporting, and he otherwise generally and predictably defended his newspaper.  In sum, Mr. Calame's testimony at trial, viewed as a whole and in a light most favorable to Plaintiff, does not provide clear and convincing evidence from which actual malice could be imputed to Dow Jones on a theory of ratification by Mr. Calame.

Plaintiff also argues that actual malice can be attributed to Dow Jones because of its failure to repudiate Ms. Jereski's story or to retract the false statements.  Plaintiff contends that this inaction constituted ratification by Dow Jones of the libelous content.  The "failure to retract" evidence centers on three letters that were sent to the *Journal* after the Article was published:  (1)  a "news release, for immediate release" from MMAR, dated October 21, 1993, addressed to the Managing Editor of the *Journal* and signed by MMAR's Chief Executive Officer, copied to the *Journal*'s lawyer and to Ms. Jereski (Plaintiff's Exhibit No. 56); (2)  a letter dated October 28, 1993, addressed to the *Journal*'s Managing Editor, signed by Raymond James's William Robinson, copied

18

to the *Journal*'s lawyer and to Ms. Jereski (Plaintiff's Exhibit No. 57); and (3) a letter from Robert Thomas Securities, Inc., dated November 1, 1993, addressed to Ms. Jereski and signed by J. Stephen Putnam, President of the company. (Plaintiff's Exhibit No. 58). Each of these letters pointed out certain claimed errors of facts or emphases in the Article.

MMAR's letter from its chief executive officer, although addressed to the *Journal*'s Managing Editor, is boldly marked "NEWS RELEASE," with the subcaption "For Immediate Release." It bears the markings not so much of a demand for a retraction (such words as "retraction" or "correction" are not used in the letter) as of a letter to the editor in the form of a press release, in which MMAR's CEO refuted two, and arguably three, of the five statements that the jury found were libelous. MMAR's chief executive officer closed the news release/letter by stating, "MMAR hopes and expects that the *Wall Street Journal* (and MMAR's clients) will recognize the real facts and the truth rather than accept the false statements, unfounded implications and malicious innuendos made by disgruntled former employees (or defendants in the fraud suit) and as reported by Ms. Jereski in what can only be described as a slanderous and 'muckraking fashion'." The second letter, which was signed by Mr. Robinson, who was not an employee of MMAR, concluded with an expression of "trust that you and the *Wall Street Journal* will do whatever is necessary to make the appropriate corrections and advise Ms. Jereski accordingly." The third letter, from Mr. Putnam of Robert Thomas Securities, expressed Mr. Putnam's

19

disturbance "by the implications in your article and the quotations of Bill Robinson a former department head of the taxable fixed income desk," but made no demand for any correction or retraction.

Even if the letters had contained clear demands for retractions of specific statements, "failure to retract upon [the plaintiff's] demand . . . is . . . not adequate evidence of malice for constitutional purposes." New York Times, 84 S. Ct. at 729. Under certain circumstances, however, evidence of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory might be relevant in showing recklessness at the time the statement was published. Golden Bear Distributing Sys. v. Chase Revel Inc., 708 F.2d 944, 950 (5th Cir. 1983), quoting RESTATEMENT (SECOND) OF TORTS § 580A & cmt. d (1977). The letters and the fact that no retractions were made were admitted at trial, but such evidence in this case is insufficient to establish with convincing clarity the presence of constitutional malice.    A decision not to retract, indeed, may just as well indicate that the publisher believed and still believes that the falsehood was true.

The Journal's failure to retract, considered together with evidence of other post-publication conduct by Dow Jones's employees, including their receipt of the three letters above described and the trial testimony of Mr. Calame, Ms. Miller, Mr. Clements, and Ms. Jereski, in which each in varying degrees persisted in defending the truth or substantial truth of what had been written, and with reasonable inferences drawn most favorable

20

to MMAR, do not amount to clear and convincing evidence that Dow Jones ratified the knowing publication of false and defamatory statements about MMAR and thus acted with actual malice.  Moreover, Dow Jones's witnesses' defense at trial of the challenged statements as being true or substantially true based upon their beliefs that the main point of the statements, compared to the literal truth, would be no more damaging to the subject business than would be the literal truth, does not provide a sufficient evidentiary basis in this case for a reasonable jury to find that Dow Jones ratified the knowing publication of false and defamatory statements in 1993.

In sum, with regard to the entirety of Plaintiff's claim to recover punitive damages from Dow Jones for its actual malice, the evidence is insufficient to permit a reasonable jury to find with the convincing clarity required by the First Amendment that Dow Jones published the false and defamatory statements with knowledge of their falsity, or with a high degree of awareness of their probable falsity, or with serious doubt as to the truth of any of the statements, or that Dow Jones ratified any such conduct. Accordingly, Dow Jones is entitled to judgment as a matter of law on Plaintiff's claims that Dow Jones acted with actual malice and is liable for punitive damages.

## The Verdict on Punitive Damages
## Against Laura Jereski

In contrast to the evidence of actual malice against Dow Jones, the evidence of actual malice against Laura Jereski is sufficient to allow a reasonable jury to conclude with convincing clarity that Ms. Jereski published the statements found by the jury to be false and defamatory with knowledge of their falsity, or with a degree of awareness of their probable falsity, or with serious doubt as to their truth. In addition to the evidence regarding Ms. Jereski's investigation, and the evidence of discrepancies between what she was told and what she wrote, there is also considerable evidence that enmity developed between Ms. Jereski and those acting for MMAR during her preparation of the Article. For example, a month before the Article was published, MMAR's lawyers addressed a letter to the *Journal*'s lawyer, Mr. Karle, stating concerns about Ms. Jereski's competence as a reporter. Ms. Jereski was accused of improperly raising certain issues with MMAR's clients and it was claimed that if she continued in like fashion her conduct "may cause inexcusable and irreparable damage to MMAR." (Defendants' Exhibit No. 37). The tension between MMAR and Ms. Jereski increased when MMAR refused to grant a personal interview to her. MMAR insisted that Ms. Jereski submit written questions, a number of which were framed in a hostile tone, and which MMAR answered in a sometimes truncated or curt fashion. This and other evidence support inferences that personal hostility existed between MMAR and Ms. Jereski before she completed the Article.

22

The presence of a motive to publish a false statement is a proper evidentiary consideration in a case such as this. *See* <u>Brown v. Petrolite Corp.</u>, 965 F.2d 38, 47 (5th Cir. 1992) ("The record reveals that Petrolite had the motive to publish a false report and that it acted negligently in preparing the report.").[3] The evidence of MMAR's preemptive complaints to Ms. Jereski's still relatively new employer, and MMAR's declared mistrust of Ms. Jereski that was emphasized by its refusal even to grant her a personal interview, constituted facts from which a reasonable juror might have inferred that Ms. Jereski was motivated to retaliate against MMAR with the pen as her weapon. In sum, after consideration of all of the evidence regarding Ms. Jereski, including, but not limited to the evidence briefly noted above, viewed in a light and with all reasonable inferences drawn most favorable to Plaintiff, the Court concludes that there was substantial evidence from which a reasonable juror might find with convincing clarity that Ms. Jereski acted with actual malice. Accordingly, the Motion for Judgment as a Matter of Law on the issue of punitive damages against Ms. Jereski must be DENIED.

---

[3]     There is no evidence, and Plaintiff has made no argument, that the *Journal* itself or any of its managing agents had any motive whatever to retaliate against or to libel Plaintiff. Apart from the *Journal*'s lawyer who received the letter from MMAR's lawyer, and who had no authority to publish the Article, it appears that there was no interaction by MMAR with any employee of the *Journal* except Ms. Jereski.

ORDER

For the reasons set forth above, it is

ORDERED that Defendants' Post-Verdict Motion for Judgment as a Matter of Law (Document No. 177) is GRANTED with respect to Plaintiff's claim for punitive damages against Defendant Dow Jones; and Defendants' motion is otherwise DENIED; it is further

ORDERED that Plaintiff's Motion for Entry of Judgment (Document No. 178), except for punitive damages against Defendant Dow Jones is GRANTED.

The Clerk will enter this Order and send copies to all parties of record.

SIGNED at Houston, Texas, this 23ᵈ day of May, 1997.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

24